CUSTODY OF A MINOR (No. 3). October 5, 1983. *Minor,* Custody. *Parent and Child,* Care and protection of minor. *Evidence,* Privileged communication, Hospital record. *Jurisdiction,* Custody of child.

On April 22, 1978, the father, Thomas,[1] feeling ill, went by ambulance to Massachusetts General Hospital in Boston. He brought with him

---

[1] Names of parents and child are fictitious.

his daughter, Delia, then three and a half months old, as he felt he could not safely leave her at home with the mother, Caroline. Having served as baby-sitters with Delia while Thomas was attended to, and observed the situation of father and child, hospital personnel admitted Delia for custodial care; and on April 26 a representative of the hospital filed a "care and protection" petition in Boston Juvenile Court. Upon preliminary hearing on May 2, legal custody, pending investigation, was granted to the Department of Public Welfare;[2] physical custody of the child was left with the parents, who were to receive public assistance in caring for her (visiting nurse, homemaker, social worker). The court-ordered investigative report, G. L. c. 119, § 24, was submitted on the return date, June 28, and the court thereupon granted permanent custody to the department. G. L. c. 119, § 26. The child was placed in a foster home where she remained for some six months, and in January, 1979, she was transferred to a "legal risk" adoptive home.[3] She has lived there to date.

Without seeking any of the periodic six-month reviews available to them under G. L. c. 119, § 26, the parents took their appeal from the custody judgment to the Superior Court in Suffolk County pursuant to G. L. c. 119, § 27, as then in effect.[4] After trial de novo in February-March, 1981,[5] the judge found, upon evidence which he held to be "clear and convincing," that Delia was in need of care and protection, and by amended judgment of July 16, 1981, he in his turn awarded permanent custody to the department.[6]

From the judgment of the Superior Court the parents filed a timely notice of appeal to this court, but their long delay in docketing the appeal (following lengthy delay in filing the transcript) resulted in an order of the Superior Court dated December 23, 1982, dismissing their appeal for "inexcusable neglect." See Mass.R.A.P. 10(c), as amended, 367 Mass. 919 (1975). At bar is an appeal from that order, and, if it should succeed, an appeal from the custody judgment, the two appeals having been finally docketed on March 10, 1983.

1. Although we have little reason to doubt that there was fault in the appellants' forwarding of their substantive appeal, we vacate the order

---

[2] Later renamed Department of Social Services. See St. 1978, c. 552.

[3] So called because the arrangement looks forward to adoption by these foster parents, but adoption at that point is not legally assured.

[4] Appeals now go direct to the Appeals Court. G. L. c. 119, § 27, as appearing in St. 1981, c. 715, § 1.

[5] The Commonwealth was opposed by the parents. The child also appeared, separately represented by appointed counsel. Counsel, after independent inquiry, sided with the Commonwealth in supporting the custody judgment appealed from.

[6] A proceeding for dispensing with parental consent to adoption had been commenced by petition in Probate Court and was tried in May and August, 1980, but it was dismissed in September, 1982, as care and protection was still being contested. See *Adoption of a Minor*, 386 Mass. 741, 748-749 (1982).

dismissing it in order that so vital a matter for parents and child shall not fail of a review here on the merits. See Mass.R.A.P. 3(a), as amended, 378 Mass. 927 (1979); *Tammaro* v. *Colarusso*, 11 Mass. App. Ct. 44, 48-49 (1980).

2. Regarding the merits, the judge of the Superior Court had before him the full investigative report submitted to the Boston Juvenile Court, the further investigative report he had ordered, and the statements of experts evaluating the physical and emotional condition of the child. Authors of these studies testified in person. There was testimony from the professionals — social workers and nurse — who were active in the case from the beginning through the period of the child's placement in the legal risk home. The first foster mother was also called. In addition, hospital records were received comprising the medical and psychiatric histories of the parents over a period of years. On the part of the parents, counsel cross-examined Commonwealth witnesses but did not affirmatively offer professional or expert evidence except for testimony by a pediatrician who had early treated the child. Thomas testified, as did a neighbor.

The record made below yields the following without material contradiction. Caroline was repeatedly diagnosed as exhibiting patterns of schizophrenia of the paranoid type with hallucinatory intervals. She was detached from reality. Thomas had long-term physical ailments, real or imagined. He was not as bad a psychotic case as Caroline, but he suffered from deep anxieties and depressions and had a serious problem of overindulgence in alcohol.[7] Caroline's disabilities were such that she could not and did not figure at all as a parent and, besides, one can fairly infer, she might pose an actual danger to the child. Thomas's love for Delia was genuine and he had skills at household chores (indeed he had to manage the house without help from Caroline), but he was not well adapted to caring for the child,[8] nor could he be counted on to pay consistent attention to her; one apparent reason for this was that he was consumed by a need to take care of Caroline if she was to remain at large. That Caroline had a null capacity for "parenting," and that Thomas could not be expected to do the job for both, was attested by those who had the two under actual observation. Delia had a precarious beginning while in the physical custody of her biological parents. She improved in her first foster home and flourished in the safe and loving ambience of the adoptive home. She had become bonded to the couple there: they were her "psychological parents." It would be a bad wrench to attempt to return the

---

[7] Thus a foot patrolman in Watertown, where the parents resided, testified that he saw Thomas drunk on the streets on some ten to twelve occasions in the period July-September 1980; he had once to be taken into "protective custody."

[8] During the time the parents had physical custody of Delia, a cousin of Thomas filed an "abuse or neglect" report under G. L. c. 119, § 51A. She referred to Thomas's drinking.

child to her natural parents and the prognosis for her was unfavorable if such a course was taken.

"[T]he critical question is whether the natural parents are currently fit to further the welfare and best interests of the child." *Bezio* v. *Patenaude,* 381 Mass. 563, 576 (1980). The record herein provides "clear and convincing" evidence in the negative about the several factors that are tributary to a conclusion, see *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 587-592 (1981); *Custody of a Minor,* 383 Mass. 595, 601 (1981), and so the judge held.[9] We note further: First, "care and protection" may serve a preventive as well as a remedial purpose, see *Custody of a Minor (No. 2),* 378 Mass. 712, 720 (1979); *Custody of a Minor (No. 1),* 377 Mass. 876, 882-883 (1979), thus it is no novelty for the Commonwealth to assert its interest and concern when the child at risk is very young. See *Custody of a Minor (No. 2), supra* at 713; *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 13 Mass. App. Ct. 901 (1982). Second, besides weighing the capacities of mother and father as individuals, the court is to try to envisage how they interact to constitute a unitary household for the care of the child. See *Bezio* v. *Patenaude, supra* at 574; *Wilkins* v. *Wilkins,* 324 Mass. 261, 264 (1949).

We have to add that the judge's findings could have been improved by more detail and a more calculated sequence or arrangement. See *Custody of a Minor (No. 2), supra* at 722. The record, however, is so strong and so lacking in substantial contradiction as to the essential issues that the formal weaknesses in the findings can be safely overlooked. Cf. *Cormier* v. *Carty,* 381 Mass. 234, 236-238 (1980); *Commonwealth* v. *Myers, ante* 554, 555 (1983); *New Palm Gardens, Inc.* v. *Alcoholic Beverages Control Commn.,* 11 Mass. App. Ct. 785, 794-795 (1981). Our ruling in the present case, we hasten to say, is not intended to signal a relaxation of the standards established for demonstrative findings in child custody cases; on the contrary, we reemphasize their importance.

3. To deal with particular points. (a) The parents objected to testimony by a social worker, citing the social worker-client privilege of G. L. c. 112, § 135 (as in effect before its amendment by St. 1981, c. 91, § 1).[10] As the judge, in overruling the objection, confined the witness to what she had observed, evidently no "information . . . acquired from" clients was

---

[9] The judge below anticipated the decision in *Santosky* v. *Kramer,* 455 U.S. 745, 769-770 (1982), which requires proof at the "clear and convincing" level before care of a child is withdrawn from the biological parents. Cf. *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 15 Mass. App. Ct. 916, 917 (1983); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 15 Mass. App. Ct. 975 (1983).

[10] The 1981 amendment added clauses (*d*) and (*e*) to § 135, tending to align § 135 with G. L. c. 233, § 20B, including provision for hearing in chambers (see *infra*).

involved which it is the aim of the statute to protect against unconsented to disclosure. Anyway, this witness's testimony added nothing of consequence to the testimony of the three other social workers, who testified without objection. We need not decide whether the evidence in question fell within the exception of § 135(*b*) for "communication[s]" regarding "commission . . . a harmful act." See *Petition of the Dept. of Pub. Welfare*, 13 Mass. App. Ct. at 903. See generally *Commonwealth* v. *Collett*, 387 Mass. 424 (1982).

(b) The hospital records were properly received in accordance with G. L. c. 233, § 79 (see *Bouchie* v. *Murray*, 376 Mass. 524, 527-529 [1978]), unless they came within the psychotherapist-patient privilege of G. L. c. 233, § 20B. But the latter is subject, in child custody cases, to an exception where the judge upon a hearing in chambers decides, in discretion, for stated reasons, that the psychotherapist has evidence that should be heard. The judge here examined the records in camera under, or on practical analogy to § 20B(*e*); even so, he appears not to have utilized information received from the patients.[11] (We take note that neither with respect to the present question of privilege nor the one discussed in the preceding point do the parents make any argument in their brief beyond bare mention. See Mass.R.A.P. 16[a][4], as amended, 367 Mass. 921 [1975].)

(c) The foster parents at the legal risk home were allowed to file an appearance by leave of court but took minimal part in the proceedings; they were not allowed to introduce evidence or object to its admission or examine witnesses. There was no error in permitting such participation. See *Custody of a Minor (No. 2)*, 13 Mass. App. Ct. 290, 302-303, vacated on other grounds, 13 Mass. App. Ct. 1088 (1982); *Care & Protection of Two Minors*, 12 Mass. App. Ct. 867, 869 (1981).

(d) At the time the care and protection proceeding was begun in Boston Juvenile Court, the child was physically present in a hospital in Boston, within the territorial purview of that court. That presence, we think, was enough to vest "jurisdiction" in the court in the sense in which the term is used in G. L. c. 119, § 24, as appearing in St. 1972, c. 731, § 8, although the parents then resided in Watertown, Middlesex County. Cf. *Murphy* v. *Murphy*, 380 Mass. 454, 458 (1980). It follows that there was "jurisdiction" for the appeal by trial de novo in the Superior Court, Suffolk County. See G. L. c. 119, § 27, as amended by St. 1973, c. 1005.

---

[11] Section 20B(*e*) by its wording applies most readily to a case where the psychotherapist is proposed to be called as a witness and the judge holds a "hearing in chambers," presumably with the psychotherapist present, to decide whether the expected testimony should be received. In the case at bar the hospital records offered were voluminous. The judge undertook to examine the records in camera and no objection was taken to his method. (The case of *Usen* v. *Usen*, 359 Mass. 453, 456 [1971], is not in point: the statute was different and, in any case, "There was indeed no attempt to follow the procedure prescribed.")

Objections to the jurisdiction of both courts, taken at the trial, were rightly overruled.

(e) An attack, largely adjectival, was launched by the parents on the constitutionality of G. L. c. 119. It is enough to refer to *Custody of a Minor (No. 2)*, 378 Mass. at 716-719, dealing with the validity of §§ 24 and 26.

*Judgment affirmed.*

*James M. Delaney* for the parents.
*Peter M. Gately* for Department of Social Services.
*Mary K. Ryan* for the minor.