### CUSTODY OF A MINOR.

Suffolk. February 25, 1985. — October 1, 1985.

Present: ARMSTRONG, KASS, & FINE, JJ.

*Minor,* Custody. *Parent and Child,* Custody of a minor. *Evidence,* Relevancy and materiality, Privileged communication.

In a proceeding brought by the Department of Social Services pursuant to G. L. c. 119, § 23, the decision of a Probate Court judge finding each of the estranged parents of a minor child, who had been in the custody of the department from the age of six weeks, to be currently unfit as a parent was warranted by the circumstances, including the mother's long pattern of incapacity or indifference toward the minor child and four other children she had given up for adoption, her inconsistency in cooperating with the department, the child's good and long-standing adjustment to her foster home, considered in light of her peculiar need for continuity of care, the child's negative reactions to her mother's visits, and, in relation to the father, his absence from the scene for months at a time, his inappropriate interaction with the child and his inability to offer a stable home environment or financial support to the child. [6-8]

On appeal from a decision of a Probate Court judge finding each of the parents of a minor child unfit as a parent and granting custody to the Department of Social Services pursuant to G. L. c. 119, § 23(C), there was no merit to the mother's contention that the unfitness standard set forth in § 23(C) was unconstitutionally vague. [8-9]

The fact that the Department of Social Services in seeking continued custody of a minor child brought proceedings in a Probate Court under G. L. c. 119, § 23(C), rather than in a District Court or a Juvenile Court under

G. L. c. 119, § 24, did not deprive the child's mother of due process of law. [9]

In a proceeding by the Department of Social Services seeking continued custody of a minor child who had been in the custody of the department from the age of six weeks, there was no error in the admission of certain evidence with respect to an infant son living with the mother at the time. [9-10]

On appeal from a decision of a Probate Court judge determining that the father of a minor child was currently an unfit parent for the child, there was no merit to the father's contention that the judge's finding was improper because it was based upon a wholesale adoption of a psychiatrist's testimony, where, even assuming that testimony by itself would not have provided a sufficient basis for the judge's own independent finding, there was other compelling testimony on which to base a finding of the father's unfitness. [10]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on January 8, 1982.

The case was heard by *Robert L. Yasi,* J.

*Linda E. Giles* for the mother.

*Bernard W. Fang* for the father.

*Kathleen M. Bowers,* Assistant Attorney General, for Department of Social Services.

FINE, J. From the age of six weeks, Michelle, born on November 30, 1981, has been in the custody of the Department of Social Services (the department), and she has been cared for in a foster home where she has developed a close attachment to both her foster parents. Both Michelle's biological mother and her biological father, estranged from each other since before Michelle's birth, appeal from a decision of a judge of a Probate Court finding each of them to be currently unfit as a parent for Michelle and granting custody to the department pursuant to G. L. c. 119, § 23(C). That section, as appearing in St. 1973, c. 925, § 40, states that the department "may seek and shall accept on order of a probate court the responsibility for any child under eighteen years of age who is without proper guardianship due to the death, unavailability, incapacity or unfitness of the parent . . . ."

The judge heard evidence in the case on five separate dates between June 20, 1983, and December 5, 1983. He issued his

findings of fact and rulings of law on April 10, 1984. On March 11, 1985, having heard oral argument on February 25, 1985, we remanded the case for further hearing in the Probate Court. At the time of the remand, we were particularly concerned about changes in the mother's circumstances which had occurred around October of 1983 and the possible effect of those changes on her ability to provide care for Michelle. The changes related to the mother's housing situation and her general stability. The significance of these changes was not reflected in the judge's original findings. Further hearings were held in April of 1985, and further findings of fact and conclusions of law were entered by the probate judge on April 17, 1985.

We summarize the facts based upon the original findings of the judge, upon his further findings, and upon uncontroverted evidence.

*The mother.*

The biological mother is in her late twenties. Starting around 1973, she led a chaotic and unstable existence in the course of which she married more than once and gave birth to four children, all of whom she was unable to care for and eventually gave up for adoption. Before Michelle was born, the mother lived in a series of shelters for the homeless, some of the moves being occasioned by her erratic behavior. She lacked regular employment and a reliable means of support. She was on medication for epilepsy. At some point she abused drugs. When Michelle was born, the department, alerted by the hospital which managed the pregnancy and birth, determined that there was cause to investigate and monitor Michelle's progress. During the first six weeks of Michelle's life she lived with her mother in a temporary shelter. During that period, the mother had seizures because she did not consistently take her epilepsy medication.

At 3:00 A.M., on January 8, 1982, the mother brought Michelle to Massachusetts General Hospital for treatment of a stomach disorder. Although Michelle's medical condition did not require her hospitalization, she was admitted as a patient because the hospital staff, based upon the mother's agitated

behavior, had concern for the infant's well-being. Thereupon the department obtained temporary custody pursuant to G. L. c. 119, § 23(C), and placed Michelle in foster care with the family with whom she currently resides.

The case was assigned to Essie Paradora, a social worker in the department's East Boston office. From January until July of 1982, Paradora worked with the mother to develop and carry out a service plan. The plan called for regular visitation with Michelle, including some weekend visits. During these visits, the mother interacted appropriately with Michelle. The mother missed many visits, however, and she consistently needed to be reminded of them. In April of 1982, the mother moved to a rooming house where she received some support in caring for Michelle. The mother's medication was stabilized. By July of 1982, Paradora was able to recommend, subject to two conditions, that Michelle be returned to the care of her mother the following September, with daily monitoring of their progress by the department. The conditions were the mother's continued residence in the rooming house and her cooperation with a service plan, including involvement in a parenting group.

In July of 1982, responsibility for the case was transferred to Steven Duca, a social worker in the department's Jamaica Plain office. About the time of the transfer of supervision, the mother was evicted from the rooming house in which she had been living, and her housing situation deteriorated. Between September of 1982 and October of 1983 she lived for brief periods in four different shelters for the homeless. She did not attend any parenting group. During this period she exhibited some wild mood swings. Duca requested that she and Michelle be evaluated by Dr. Margaret Gean, a child psychiatrist. The mother missed several scheduled appointments to be evaluated, but she did eventually participate in the evaluation. Dr. Gean concluded that Michelle suffered from slow development, due in part to the stress of the visitation and certain prenatal and postnatal physical conditions. Noting that, in her view, any change of primary caretaker may be stressful for a child during her first three years, and, given the increased risk to Michelle because of her slow development, Dr. Gean recommended

continuation of the foster care and termination of visitation. Nevertheless, visits between Michelle and her mother continued up to the date of the first set of hearings, with appropriate interaction between the two. However, at least a quarter of the visits were missed by the mother during that period.

In February of 1983 the mother remarried. Her husband was supportive and helpful on Michelle's visits. In July of 1983, the mother gave birth to a son. The mother, her husband, and their son commenced occupancy in an apartment in Lynn in October, 1983. The husband became employed part time. The mother was receiving welfare assistance and the services of a visiting nurse. There were no continuing problems with the mother's epilepsy medication.

As of April, 1985, when the second set of hearings was held after our remand order, the mother was living with her husband and caring for the couple's infant son in suitable housing, and she was babysitting regularly for a neighbor. On the other hand, problems concerning care of her son had resulted in intervention by the department, and the services offered to help her care for him were rejected. The husband was no longer employed. The family had been evicted from the Lynn apartment in October, 1984, for nonpayment of rent. They lived for a while in a Revere motel before moving to an apartment in Revere. Of the regular visits scheduled for Michelle, the mother missed more than half. Between October of 1984 and March of 1985, she attended only four of the scheduled biweekly visits. Many of the visits proved difficult for Michelle, producing an intense negative reaction on her part. Dr. Gean, called in once again to evaluate Michelle, concluded that the visits were producing an extraordinary amount of stress and that Michelle's reaction to separation from her primary caretakers, the foster parents, was extraordinarily severe. Dr. Gean concluded that separations producing such severe reactions could lead to long-term psychological disturbances. The mother's new social worker, Catherine Kalpin, offered a comprehensive service plan, but the mother failed to cooperate in carrying it out.

*The father.*

The biological father first made himself known to department personnel in June of 1982 when Michelle was seven months old. Visits between him and Michelle were arranged on a weekly basis between August, 1982, and January, 1983. During this period, the father did not develop an appropriate relationship with Michelle. On November 24, 1982, Dr. Gean evaluated him for parental fitness. She noted that he had a history of being an abused child; that from the age of seven he had been placed outside his home; that for lengthy periods he had been in mental hospitals; and that from the age of seventeen to twenty-five he had been in correctional institutions. She noted his lack of employment and a stable home; she detected paranoid tendencies and concluded that he was incapable of caring for his own needs, let alone those of a young child. She recommended against further visitation.

Between January, 1983, and the date of the second set of hearings following the remand order, the father had disappeared and reappeared several times. While he was in contact with the department, a service plan was adopted and some visitation occurred. However, he was incarcerated again between June, 1984, and March, 1985. During his incarceration, it was necessary for him to be hospitalized because of an incident in which he swallowed razor blades. He was evaluated in prison by Dr. Michael Mendelson, a psychologist, who concluded that he was not capable of caring for Michelle. He lacks suitable housing, and he is unemployed, supporting himself on general relief. He has not seen Michelle since the fall of 1983.

*Conclusions as to Custody.*

We first address the issue whether the judge erred in awarding permanent custody to the department. The legal principles applicable to such custody disputes are well established. They are easier to state than to apply. Rather than repeat the principles at length, we refer to the spate of recent cases setting forth those principles. *Bezio* v. *Patenaude,* 381 Mass. 563, 577 (1980). *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 591 (1981). *Custody of a Minor,* 389 Mass. 755, 765-766 (1983). *Care & Protection*

*of Three Minors,* 392 Mass. 704, 711-712, 714-716 (1984). *Custody of a Minor (No. 2),* 392 Mass. 719, 723-725 (1984). *Guardianship of a Minor,* 19 Mass. App. Ct. 333, 336 (1985). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 20 Mass. App. Ct. 689, 693 (1985). Very briefly, as those principles apply to this case, the issue is the current fitness of the biological parents to further the welfare and the best interests of the *particular* child. The guiding principle is that the biological parents have a fundamental right to the custody of their children. The right is not absolute, however. It must be considered with all the other factors, with primary reference to the welfare of the child. Included among the factors to be considered, although very cautiously, are any lengthy separation of parent and child and any intervening growth of ties between the child and the substitute caretakers. A parent's poverty or unconventional life-style, or failure at some time in the past to provide custodial care, is not alone a sufficient basis for a finding of unfitness.

Applying these guidelines, we conclude that the judge's findings were sufficient to support his conclusions. We examine the findings with respect to each of the biological parents separately.

As to the mother, we point out that our conclusions speak to the present and not the future. She may petition for review of the order in the future should she so choose. We note the increasing potential she demonstrated to be a fit parent for Michelle.[1] She is older; she has an apparently stable marriage; she resides in a suitable dwelling; she keeps herself properly medicated; for several months she has been entrusted by a neighbor with the care of another infant. Notwithstanding some difficulties, she has not been found unfit to care for her own infant son. She is now accepting some counselling and has indicated a willingness to accept services from the department. Nevertheless, following the remand order, the judge concluded

---

[1] The probate judge made a finding that continued visitation with the mother would be harmful to Michelle but made no order requiring that the visits be discontinued. The issue of visitation, therefore, is not before us.

that the mother's potential to be a fit custodial parent for Michelle, demonstrated by the changes in her life situation commencing in October of 1983, had not materialized to an extent sufficient to justify a change in the custodial arrangement. We think the judge's conclusion was supported and warranted by a combination of factors: the mother's long pattern of incapacity or indifference towards her children; her inconsistency in appearing for scheduled visits with Michelle and in cooperating to carry out appropriate service plans relating to both Michelle and the infant son; Michelle's good and longstanding adjustment to her foster home, which we consider in the context of the peculiar need she has, because of her slow development and other psychological vulnerabilities, for continuity of care; and, especially, Michelle's severe negative reactions to her mother's visits.

As to the father, he offers considerably less potential as a primary caretaker than does the mother. Unlike her, he was absent from the scene for months at a time, and he interacted inappropriately with Michelle. He was unable to offer her a stable home environment or financial support. He also testified that, although he was seeking custody for himself, he approved of the home in which she was being cared for. At one point, he told the social worker that he was abandoning his effort to gain custody.

Thus, the judge was warranted in concluding, on the basis of clear and convincing evidence (*Santosky* v. *Kramer,* 455 U.S. 745, 747-748 [1982]), that neither the mother nor the father is currently a fit parent for Michelle and that the department should have custody. There was considerably more on this record than poverty, an unconventional life-style, and a concern for maintaining the status quo.

*Other issues.*

Each of the biological parents has raised other arguments on appeal. The mother argues in her brief that the "unfitness" standard set forth in G. L. c. 119, § 23(C), is unconstitutionally vague. This issue, raised in connection with the same "unfitness" standard in G. L. c. 201, § 5, has been resolved unfavorably to the mother's contention, however. *Guardian-*

*ship of a Minor,* 1 Mass. App. Ct. 392, 395 (1973). See also *Custody of a Minor (No. 2),* 378 Mass. 712, 718-719 (1979). Nor was the mother's right to due process violated as she claims because the matter was pursued by the department in a Probate Court under G. L. c. 119, § 23(C), rather than in a District Court or a Juvenile Court under G. L. c. 119, § 24. The test for custody is the same — the fitness of the biological parents to further the welfare and best interests of the child (*Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589-591 [1981]), and the procedural rights are not significantly different under the two statutes.

Finally, the mother argues that the judge erred in admitting, over her objection, two items of evidence concerning her infant son. Kalpin, the social worker assigned to the mother, was permitted to testify that the infant had been hospitalized at one point for "flu-like symptoms" and "failure to thrive." Evidence concerning the infant was relevant. The mother's difficulties in caring for one child certainly speak to her ability to assume the added responsibility of caring for another child. Nor was the evidence privileged and therefore inadmissible under G. L. c. 112, § 135. Even if the statute were applicable in this proceeding, notwithstanding the exception in G. L. c. 112, § 135(d), the evidence was not of the type covered since the infant, on whose privilege the mother relies, was not the source of the social worker's information. The mother also objected to a portion of a medical record concerning the infant which referred to his "delayed development" and the fact that the mother had a seizure disorder and had refused to participate in an infant stimulation program. Other than the reference to the infant's delayed development, the material in the record to which the mother objected was the subject of testimony from various witnesses at trial, and its admission, therefore, was harmless. The reference to the infant's delayed development was relevant to the mother's ability to take on the responsibility for the care of another child, particularly one who could be expected to have a difficult time adjusting to a new family. The evidence did not consist of information given to a social

worker and, therefore, was not privileged under G. L. c. 112, § 135, and it was a record admissible under G. L. c. 233, § 79.

The father argues that the judge's finding with regard to his unfitness was improper because it was based upon a wholesale adoption of the psychiatrist's testimony. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. at 593. Without implying that the psychiatrist's testimony would not by itself have provided a sufficient basis for the judge's own, independent finding, we think there was abundant compelling evidence, apart from the psychiatrist's testimony, on which to base a finding of the father's current unfitness to care for Michelle. The father argues further that the department was remiss in not providing a timely service plan. We do not see how the finding of current fitness could have been otherwise even had a plan been provided at an earlier time. Under the plan adopted after several evaluations, the father would have had to undertake a period of long-term therapy before custody could even begin to be considered. In any event, assessing the record as a whole, it is clear that the department has dealt with the parties reasonably and in good faith in carrying out its primary mission, ensuring the welfare of the child. Any procedural irregularities, if they exist, would not justify setting aside the court order. Any issues concerning the father's visitation or other rights may be raised in the Probate Court.

*Decree affirmed.*