NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-189                                          Appeals Court

CARE AND PROTECTION OF LAURENT.[1]


No. 14-P-189.

Middlesex.     September 5, 2014. - January 9, 2015.

Present:  Green, Graham, & Katzmann, JJ.


Minor, Care and protection.  Parent and Child, Care and
     protection of minor.  Practice, Civil, Care and protection
     proceeding, Findings by judge.



     Petition filed in the Middlesex County Division of the
Juvenile Court Department on October 17, 2011.

     The case was heard by Kenneth J. King, J.


     David J. Cohen, Committee for Public Counsel Services, for
the mother.
     Richard A. Salcedo for Department of Children and Families.
     Julia A.B. Pearson for the child.


     GRAHAM, J.  On October, 17, 2011, the Department of

Children and Families (department) filed a care and protection

petition in the Middlesex County Division of the Juvenile Court

---

     [1] A pseudonym, as are all the children's names in this
decision.

Department pursuant to G. L. c. 119 § 24, alleging Laurent was a child in need of care and protection. On that day, the trial court judge granted temporary emergency custody of Laurent to the department. The department later placed him in foster care, where he remained through the conclusion of the trial.

Trial on the department's petition occurred over seven non-consecutive days, beginning on November 1, 2012, and concluding on January 3, 2013. On February 21, 2013, the judge found the mother unfit, essentially, on the basis that she was too cognitively limited to parent the child. Accordingly, the child was committed to the custody of the department, with reunification as the plan.

On appeal, the mother contends that the judge's findings regarding her parenting deficiencies, taken as a whole, do not support a conclusion that the child was at risk of serious harm, and thus in need of care and protection.[2] We agree with mother and, accordingly, reverse the judgment.

1. Background. We summarize the material facts from the judge's extensive findings, which are supported by the evidence, and essentially undisputed.

---

[2] The judge concluded that although Laurent's father attended court hearings and paid child support, he had never visited Laurent since the case had begun; hence, he lacked an ongoing relationship with Laurent and could not care for him.

Laurent is one of five children born to the mother, who was forty years old at time of trial. The mother experienced significant trauma and neglect as a child. As a child, the mother contracted lead poisoning, which resulted in severe developmental disabilities. In addition, the mother sustained a skull fracture when she was eight years old. When she was fourteen, she was placed in department custody due to abuse and neglect. She was placed in foster care and residential programs through her teens. When the mother turned eighteen years old, she was released from department custody, and eventually returned to live with her mother.

The mother has an extensive history of alcohol and cocaine abuse. In addition, she has been diagnosed with attention deficit hyperactivity disorder (ADHD), anxiety, and "executive function impairment" (cognitive impairments), all of which significantly compromise her ability to understand, process, and retain information. The mother's cognitive impairments presented challenges that led to an unsuccessful school career. However, after attending a residential home in her teens and the Learning Prep School in the West Newton area of Newton, she obtained her graduate equivalency degree. Moreover, she has been gainfully employed in the past, and has resided at the same address for the five years prior to trial. At the time of the trial, the mother was unemployed, receiving cash benefits from

the State, section 8 housing assistance, and supplemental nutrition assistance program benefits.

The mother's four other children, ages fourteen through twenty-one at the time of trial, have been involved with the department, and all of them have been adopted. Her oldest three children were adopted when they were very young by a New Hampshire family with which the mother remains in contact and visits several times each year. The mother lost custody of her fourth child, Bill, after the department found that the mother seriously neglected him while under the influence of alcohol and cocaine. Bill was adopted by a family with whom the mother does not have contact.

Laurent, nine years old at the time of the trial, has been diagnosed with ADHD, an adjustment disorder with mixed anxiety, depressed mood, obesity, and asthma. At the time of the trial, Laurent was prescribed Ritalin and Guanfacine to treat ADHD, Albuterol and Flovent to treat his asthma (with medication administered by inhaling through a nebulizer), Clonidine as a sleep aid, and Zyrtec, an over-the-counter allergy medication. While Laurent was in the mother's care, he had not learned how to use the nebulizer properly.

The department's first supported G. L. c. 119, § 51A (§ 51A), report was in June, 2010. The department opened the investigation following a § 51A report that Laurent ran out of

the house looking for help because he could not wake up the mother, who had consumed alcohol, and had accidentally ingested some of her son's medication. The department supported allegations of neglect following this incident and assigned a social worker, Eric Rollins, to meet with the mother at least once per month. The meetings between Rollins and the mother were generally positive and Rollins considered closing the mother's case because he was not concerned that Laurent was abused or neglected.

However, on October 15, 2011, the department commenced an investigation following a § 51A report that led to the instant proceedings. In the early hours of October 15, 2011, the mother called the police and reported that Laurent's father had come to her house and that an altercation had ensued during which he had attempted to strangle her. She further informed the police that Laurent had left the home with father without her permission.

Police officers responding to the mother's report found her and Laurent locked out of the house, but did not confirm any marks or bruises on the mother's neck. The mother and Laurent were transported to the police station. Later, department investigators arrived at the police station and determined that the mother appeared to be highly intoxicated. After interviewing the mother, and over her protestations, the department investigators took Laurent to an emergency foster

home pending the filing of the temporary custody petition by the department. Two days later, the department was granted temporary custody of Laurent. Thereafter, the department moved Laurent to his second foster home, where he stayed for two months before being placed in his current foster home.

Following Laurent's placement in foster care, the department initially supervised weekly one and one-half hour visits between Laurent and the mother, which later became unsupervised and were extended to close to three hours. At the time of trial, Laurent visited with the mother overnight once per week.[3]

Since Laurent's removal from her care, the mother obtained a restraining order against the father for domestic abuse, and the father has not been in the mother's home since the October, 2011, incident. In addition, the mother has received individual counselling and attended department sponsored meetings designed to improve her parenting skills and to address issues of anger management, substance abuse, and relapse prevention. At trial, there was no evidence presented that domestic violence or substance abuse, the issues that spawned the department investigation, was still present in the mother's life.

---

[3] The visits had been briefly stopped due to concerns that Laurent was falling asleep at school because he would stay up too late and watch television while in the care of his mother.

The mother has also learned to prepare healthier meals for Laurent and relies less on fast food and sweets.[4]  She has also sought and received support for improving her parenting skills from Aid for Incarcerated Mothers, and, since mid-2012, from the Department of Developmental Services (DDS).  She meets twice each week with DDS providers with whom she has a positive relationship as part of an individualized action plan to address her neurological deficits.

Meanwhile, most of the issues related to Laurent's health and education have been resolved.  Prior to his removal, the mother requested an educational evaluation of him because she "had concerns about how he was learning."  The evaluation resulted in an educational enrichment plan that Laurent now has in place through which his teachers and adjustment counsellor interacted regularly with the mother.  In the fall, 2010, Laurent was in a reading recovery program for first graders, and later was referred for one-on-one tutoring at the Harvard Graduate School of Education, Language, and Literacy Program. In September, 2011, he began receiving one-on-one tutoring twice

---

[4] When Laurent was placed in foster care, the mother recognized that he was overweight.  However, she believed that his weight gain was due to the medication he was prescribed, including Clonidine, Ritalin, and steroids, which he had had prescribed for between one and three months due to a flare up of his asthma.  The mother informed the court investigator that she would work with Laurent's pediatrician to be sure he ate healthy foods and got enough exercise.

per week.  He attends an after school program, can complete his homework with staff support, and has a mentor.

In addition, Laurent is no longer overweight and "looks like a healthy eight year old."  His foster parents changed his diet, and he engages in vigorous exercises, including biking, swimming, and karate.

The department had "intended to transition [Laurent] to the care" of the mother, but reversed itself following "reports from the school, the in-home team, his foster mother, and his therapist."  In the reports, members of the department's in-home team noted that, following Laurent's visits with the mother, his clothes smelled of smoke.  In addition, they reported that Laurent's use of the nebulizer exceeded the recommended dosages.

2.  Determination of parental unfitness.  On February 21, 2013, the judge published his conclusion that the department had proved by clear and convincing evidence that Laurent was in need of care and protection, which was followed, on July 22, 2013, by the judge's findings of fact, rulings of law and order for judgment.  The judge concluded that the evidence, taken as a whole, was "adequate, even if just barely" to support a finding of need of care and protection.  The judge relied, principally, on three categories of evidence to support his conclusion that the mother was unfit to parent Laurent:  (1) the lack of structure in the home including difficulty in assisting Laurent

with current and future school work; (2) the issues regarding Laurent's dietary and exercise needs; and (3) Laurent's difficulties in administering his asthma medication.  In addition, the judge based his decision on the mother's smoking in Laurent's presence, and Laurent's expressed preference to live with his half-siblings' adoptive family in New Hampshire.

3.  Discussion.  Parents have a "fundamental liberty interest . . . in the care, custody, and management of their child," Santosky v. Kramer, 455 U.S. 745, 753 (1982), that does not go away even when they become "something less than ideal caretakers." Care & Protection of Yetta, 84 Mass. App. Ct. 691, 695 (2014).  To interfere with the ties between parents and their children, the State has to prove parental unfitness with "clear and convincing evidence." Adoption of Carlos, 413 Mass. 339, 348 (1992).  The parental unfitness inquiry "means more than ineptitude, handicap, character flaw . . . or inability to do as good a job as the child's foster parent," Care & Protection of Yetta, supra, but rather whether "the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child." Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

"[T]he central judgment does not concern the [mother's] merits or demerits, but whether, in all the circumstances (including consideration of those merits or demerits), [she] has

the capacity to act as a fit parent." Adoption of Nicole, 40 Mass. App. Ct. 259, 262 (1996). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993).

Further, "the assessment of parental fitness must focus on the children actually involved in the proceedings, with their specific needs, interests and requirements, and not on some hypothetical child or children." Care & Protection of Olga, 57 Mass. App. Ct. 821, 830 (2003). "Fitness to act as a parent, in statutory and decisional context, involves inquiry not only into the capacity of the biological parent but into the best interests of the child." Adoption of Nicole, 40 Mass. App. Ct. at 262. Parental fitness and the child's best interests are interrelated inquiries and are considered together. See Petition of New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975) ("the tests are not separate and distinct but cognate and connected").

Here, none of the judge's findings in this case was clearly erroneous. Each finding was adequately supported in the record. It does not follow, however, that the findings, taken together, proved parental unfitness by clear and convincing evidence. For the evidence of parental unfitness to be clear and convincing,

it "must be sufficient to convey a high degree of probability that the proposition is true," Adoption of Rhona, 57 Mass. App. Ct, 479, 488 (2003), quoting from Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997), which requires "a degree of belief greater than the usually imposed burden of proof by a preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." Care & Protection of Yetta, 84 Mass. App. Ct. at 696, quoting from Custody of Eleanor, 414 Mass. 795, 800 (1993).

While the judge claimed several factors were applicable to the case, it is clear that the ultimate determination of unfitness rested primarily on the judge's assessment that the mother's cognitive disabilities would impact her ability to "understand" and "follow through on her understanding" of Laurent's needs if he were returned to her care. The judge found that there was no evidence that the mother's substance abuse problems and her involvement in abusive relationships, the issues which caused the department to remove Laurent from the mother's care, and which were responsible for the loss of at least one of the mother's other children, are currently concerns in the mother's life. Similarly, the issues surrounding Laurent's weight have largely been resolved, and Laurent is currently doing well in school.

While we agree that the judge's findings present a general source of concern for parental fitness, each is mitigated by findings discounting such risks due to the mother's compliance with her service plan, resulting in improvement in her parenting ability. DDS services could continue to offer the mother support for her parenting responsibilities.

The judge acknowledged the loving relationship between the mother and Laurent and concluded that there was no evidence that the lack of structure places Laurent's education at serious risk. The mother recognized that Laurent had difficulty in school, and ably advocated for his placement in an individualized educational plan that helped him improve his literacy.[5]

There are no findings that would support the conclusion that any of the mother's present shortcomings, including her failure to monitor properly Laurent's use of the nebulizer, or her occasional use of tobacco in Laurent's presence, have caused Laurent significant enduring harm.

---

[5] The judge found that, "[i]n view of [Laurent's therapeutic mentor] and considering that [the mother] sought out educational services for [Laurent] and supported his attendance in the after school program, the Court cannot conclude that her inability to maintain structure at home places his education at serious risk."

Laurent is no longer obese and has a "better understanding of his dietary and exercise needs."[6] Moreover, the mother has started preparing more nutritious meals.[7]

In reaching a decision of parental unfitness, a judge need not "wait for disaster to happen" and can use "past conduct to predict future ability and performance." Custody of Michel, 28 Mass. App. Ct. 260, 269-270 (1990). Nevertheless, the inquiry must focus on the mother's current ability to parent, Care & Protection of Three Minors, 392 Mass. 704, 711-712 (1984), and cannot rest on speculation. See Adoption of Yale, 65 Mass. App. Ct. 236, 242 (2005). Speculation about the mother's future ability to feed her child healthy food, for example, must stem from "credible evidence." Cf. Adoption of Serge, 52 Mass. App. Ct. 1, 7 (2001) (arguing that mother must base predictions that her parenting will improve on credible evidence and not "faint hope"). Here, the evidence points to the contrary.

As the judge noted, the department's case is "long on smoke and short on fire." Nonetheless, the judge concluded that "taken as a whole, the evidence is adequate, even if just barely," to conclude that Laurent is in need of care and

---

[6] It is worth noting that childhood obesity, lack of parental help with the child's education, and overexposure to television characterizes entire communities in Massachusetts.

[7] We note that the judge did, however, express his concern about the mother's ability to continue cooking healthy meals for Laurent if he were returned to her custody.

protection because each piece of evidence exposes Laurent to "some, albeit ill-defined, risk of harm." But some amorphous harm that does not amount to "grievous shortcoming or handicaps" is not sufficient. Care & Protection of Yetta, 84 Mass. App. Ct. at 698, quoting from Adoption of Zoltan, 71 Mass. App. Ct. 185, 189 (2008). The evidence of mother's unfitness must be "full, clear and decisive." Adoption of Rhona, 57 Mass. App. Ct. at 488. In this case, the incremental risks to Laurent simply do not add up to a substantial risk of harm.[8]

Finally, we are not persuaded that Laurent's sometimes expressed preference to live with the New Hampshire family,[9] which may be considered by the judge but does not carry dispositive weight, see Custody of a Minor, 383 Mass. 595, 602 (1981), tilts the balance in the department's favor. The judge found that Laurent's wishes are less a sign of his maturity and more a reflection of his idealized version of the New Hampshire home that he visits from time to time and where he has fun but no schoolwork or household chores.

---

[8] We note that if we were to embrace the judge's accounting of harm, no evidence of improvement in the mother's parenting skills would suffice as long as there is some residual risk resulting from the mother's cognitive challenges.

[9] Laurent had previously expressed his wish to return home with his mother.

Judgment and order reversed.[10]

                        So ordered.

_____

[10] We do not reach the issue raised by the mother in her brief of whether the judge improperly considered the "better" care that could be provided to Laurent by his half-siblings' adoptive family in New Hampshire because we conclude that, on the record in front of us, the totality of the evidence does not support clearly and convincingly a conclusion of parental unfitness under G. L. c. 119, § 26.