NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-979

CARE AND PROTECTION of MARCIE.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father and the child appeal from a judgment issued by the Juvenile Court judge finding the parents unfit and granting permanent custody of the child to the Department of Children and Families (DCF).[2] We conclude that the trial judge properly found clear and convincing evidence of parental unfitness caused primarily by the father's lack of suitable and safe housing, his neglect of the child's educational and medical needs, and his partner's untreated and unaddressed mental health issues and substance use. Discerning no significant error in the findings

---

[1] The child's name is a pseudonym.

[2] The judgment also granted permanent custody of one of the child's two siblings, who are not the father's biological children, to DCF. The child's eldest sibling obtained adulthood before the judgment. The mother, the siblings, and the siblings' biological fathers are not parties to this appeal. No party challenges the finding that the mother is unfit.

and concluding that the judge reasonably chose guardianship by DCF as the best of the imperfect options in the best interests of the child, we affirm.

1. Background. DCF's most recent involvement with the family began in November 2021, when Marcie was six years old, after a report that the family was living in a motel room and that Marcie was not attending school. Motel staff confirmed that the family was staying there, and DCF attempted to contact the family for several days before visiting in person. The mother had opened the door to DCF, but provided a false identity, claiming that DCF had the wrong room. The mother called DCF the next day, however, and admitted that she had lied about her identity. The mother eventually agreed to meet with DCF on December 6, 2021. Both the mother and the father attended the meeting and shared that Marcie had never been enrolled in school.

In June 2022, the family was evicted from the motel and moved to one in a nearby town. On July 13, 2022, the mother contacted DCF and stated that she was in Florida with the father and the children and would not be back until the end of July. Then, from late July to October 2022, notwithstanding DCF's consistent efforts, the family proved unreachable. Finally, on October 31, 2022, DCF located the eldest child at his

girlfriend's home.  The child reported that the rest of his family was in Florida, but he had stayed behind.

Shortly after the start of DCF's involvement with the family in November 2021, all three children were enrolled in the Virtual Academy, but the number of absences remained markedly high.  At one point, the Virtual Academy reported that Marcie had attended for only one hour across two days in all of April 2022.  DCF instructed the mother that Marcie and the mother's second oldest son would attend school in person for the 2022-2023 year.  The mother agreed to enroll the children herself.

In March 2022, DCF referred the family to both in-home therapy services and services to support the family with school attendance.  The family never contacted either service and failed to follow up after multiple attempts to facilitate services.  In addition, the children had not been seen by a pediatrician for approximately three years.  In April 2022, after direction from DCF, the mother brought Marcie to a doctor's appointment.  The pediatrician expressed concerns about Marcie's weight gain and noted that Marcie had "terrible dental hygiene."

By early November 2022, DCF had obtained custody of the children after learning that none of the three children had attended school for the academic year 2022-2023.  From November 2022 to December 2024, random drug screening of the mother

3

consistently detected the presence of unprescribed drugs, such as Suboxone, Benzodiazepine, and Oxycodone. The mother ignored requests for further drug testing, denied having a substance use disorder, and refused to engage in treatment or services. The father, too, rejected therapy services, and reported having no mental health concerns. After attending only three sessions, the father stopped because he did not understand why he needed therapy. He was compliant with drug evaluations and completed one parenting class. Otherwise, though, the father generally did not meet the tasks in his action plans.

The first task on each of the father's service plans required that he "obtain and maintain a safe, stable, nurturing home." Despite DCF's (and the family's own social worker's) connecting the family with resources and recommendations on housing services, the parents' housing remained unresolved as of trial. Both parents were living with the father's brother, who was a level three registered sex offender.

After a trial in June 2024, a Juvenile Court judge found that both the father and the mother were unfit and granted DCF permanent custody of Marcie. This appeal followed.

2. <u>Unfitness determination</u>. a. <u>Standard of review</u>. "To find a child in need of care and protection, there must be 'an affirmative showing of parental unfitness.'" <u>Care & Protection of Yetta</u>, 84 Mass. App. Ct. 691, 695 (2014), quoting <u>Custody of</u>

4

a Minor, 377 Mass. 876, 882 (1979). "[T]he idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'" Adoption of Yvonne, 99 Mass. App. Ct. 574, 577 (2021), quoting Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997). Specifically, a judge may consider "a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Care & Protection of Laurent, 87 Mass. App. Ct. 1, 6 (2015), quoting Adoption of Mary, 414 Mass. 705, 711 (1993). "The judge's fitness determination must be supported by 'specific and detailed' findings that demonstrate parental unfitness by clear and convincing evidence." Care & Protection of Gaston, 106 Mass. App. Ct. 450, 456 (2026), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993). The evidence adequately supported the judge's conclusion that the father's unfitness "resulted from a 'constellation of factors'" that rendered him presently incapable of providing appropriate care for his daughter. Adoption of Oren, 96 Mass. App. Ct. 842, 845 (2020), quoting Adoption of Greta, 431 Mass. 577, 588 (2000).

b. Housing instability. "While homelessness, poverty, and financial instability alone are not sufficient to terminate a person's parental rights, they are proper considerations in an unfitness determination." Adoption of Virgil, 93 Mass. App. Ct.

298, 303 (2018).  Although a child "should never be removed

. . . on the sole basis of homelessness," Adoption of Linus, 73

Mass. App. Ct. 815, 821 (2009), quoting 110 Code Mass. Regs.

§ 1.11 (2000), the judge may properly consider a parent's

"inability to secure 'adequate stable housing.'"  Adoption of

Anton, 72 Mass. App. Ct. 667, 676 (2008), quoting Adoption of

Vito, 431 Mass. 550, 555 (2000).

Here, the family has a history of housing instability.  See

Care & Protection of Lillith, 61 Mass. App. Ct. 132, 136 (2004)

(parent and child's frequent moves were factor supporting

finding of unfitness).  After moving, by agreement, from their

apartment in 2021, the family moved between friends' homes and

motels.  They then spent several weeks in Florida and, upon

returning to Massachusetts, "the only hotel [the father] could

find was in New York State."  Before the family could head to

New York, however, the children were removed from the parents'

custody.

At the time of the trial, the parents were living together

with the father's mother and brothers.  The father acknowledged

that a registered sex offender's living in the same house as him

and the mother "has been an issue for [DCF]," and that he has

asked his brother to move out "[a]t least three" times "[s]ince

the children have been taken out of [his] custody."  The father

provided no concrete timeline or plan for the brother's move out

of the house, instead simply stating, "He's working on it at the moment right now. He will be out." The mother stated that the house has three bedrooms, but she and the father sleep "[i]n the dining room." The mother also stated that, in the event of reunification, the family would live in this house and the children would sleep "[i]n the bedroom upstairs," which is the room "that [the brother] will be leaving." Nevertheless, the evidence showed that the brother still lived there, and DCF had never been allowed to visit the home because the owner, another of the father's brothers, was "not comfortable with it." There was no way for DCF to confirm whether the house would be suitable even if the sex offender did leave.

DCF reported that "[n]either parent has provided proof of efforts to obtain their own housing." When asked what he had done to secure housing for the family, the father answered, "I'm not really able to because of work." DCF confirmed that the family had no active housing assistance applications. Moreover, only the mother reported what steps the family took toward obtaining housing. The record provided adequate support for the judge's findings that the "[f]ather has not obtained a safe and stable home" or "done anything to get housing" and that "the housing issue [was] still an issue at the close of evidence." See Adoption of Yvonne, 99 Mass. App. Ct. at 581 (judge's findings "that the mother did not maintain stable housing for

7

nearly the entire duration of the proceedings, that the mother made insufficient efforts to secure such housing for herself and the children, and that the mother 'fail[ed] to appreciate the seriousness of her family's housing crisis,' were not clearly erroneous").

c. Educational and medical support. The record demonstrated that the father "had failed to meet the daily needs of the children for proper medical, dental, educational support and care." See Adoption of Anton, 72 Mass. App. Ct. at 676 ("Where a parent is ineffective in obtaining medical care for a child, causing neglect of the child, it is relevant to finding of unfitness"). As of 2022, the child had not seen a pediatrician since 2019. At the child's 2022 visit, the doctor expressed concern about her weight, as she had gained thirty-four pounds in three years. The evidence of medical neglect also included a marked failure to tend to the child's dental hygiene. The pediatrician noted that the child's teeth were "down to the gumline." Since the child had been in DCF custody, the father had attended only two of her medical appointments.

Moreover, while in the father's care, the child did not attend a single day of school for the 2022-2023 school year. Since being in DCF custody, the child was "doing well academically in school." She "excel[led] in reading and math." The mother's testimony at trial also established that, in the

8

event of reunification, the mother would be the one to "get [the child] up, have breakfast, ready for school, get her to school, come home, help her with whatever homework she would have." Despite repeated requests for a parenting plan, the father presented no alternative plan. As the judge found, although the "[m]other may have been the daily caregiver when [the father] was at work, . . . both failed to meet their children's needs for these important childhood needs." See Care & Protection of Gaston, 106 Mass. App. Ct. at 456 ("Although the father's employment constraints contributed to his unavailability for some visits, the judge properly found that the father 'contributed substantially to the lack of progress in expanding his relationship with his son' by 'putting his own needs or preferences before [his son's]'"). See also Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973), quoting Richards v. Forrest, 278 Mass. 547, 554 (1932) ("inability or indisposition to control unparental traits of character or conduct, might constitute unfitness . . . also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit").

d. General parenting capacity. The evidence supported the conclusion that the father lacked "insight into [the mother's] substance abuse and how that may negatively impact her care of

9

children."[3]  See <u>Adoption of Flavia</u>, 104 Mass. App. Ct. 40, 49 (2024), quoting <u>Adoption of Talik</u>, 92 Mass. App. Ct. 367, 374 (2017) ("The parents' pattern of minimizing responsibility for incidents resulting in harm to all three children, . . . their limited understanding of their roles in causing . . . trauma in the family . . . were 'compelling evidence for a finding of parental unfitness'").  Although the father participated in a parenting class, DCF reported that he had "yet [to] demonstrate[] the tools he learned" from the class.  See <u>Adoption of Terrence</u>, 57 Mass. App. Ct. 832, 835-836 (2003) ("evidence of the mother's participation in parenting programs at the request of DSS, without evidence of appreciable improvement in her ability to meet the needs of the child, does not undermine a finding of unfitness").  He did not engage consistently in services.  Although acknowledging that the father worked during the day, the judge appropriately noted that it nonetheless matters for the child, in light of the mother's unchallenged unfitness, that the father missed (or failed to

---

[3] DCF noted "med seeking" behavior in the mother.  The mother would report having visited the emergency room and having received prescriptions.  She was hospitalized for seizures and pain but never arranged to see a neurologist or a doctor to determine a plan of care.  She stated that she has "never had any addiction issues."  DCF requested that the father provide a list of the mother's prescription medications.  He did not do so.

attend) appointments.[4]  The father presented no parenting plan for the child, despite repeated requests from the social worker. See Adoption of Ramona, 61 Mass. App. Ct. 260, 263 (2004), quoting Custody of a Minor, 21 Mass. App. Ct. 1, 7 (1985) ("the issue is the current fitness of the biological parents to further the welfare and the best interests of the particular child").  DCF's expert opined that the father and the mother did not have "sufficient parenting capacity during the parent/child visit[s] to manage [the children's] individual social, emotional, and behavioral needs."

"All of the subsidiary facts, taken together, ultimately supported the judge's conclusion of parental unfitness by clear and convincing evidence."  Adoption of Yvonne, 99 Mass. App. Ct. at 582.  See Care & Protection of Vieri, 92 Mass. App. Ct. 402, 405 (2017), quoting Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) ("Evidence such as the failure of the parents to keep a stable home environment for the children, the refusal of the parents to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness").

---

[4] The judge also found that the DCF social worker failed to invite the parents to some medical appointments.

3. Judge's findings. a. Standard of review. "In care and protection cases, the judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). "'[I]n this field it is neither possible nor desirable to make decisions with precision, and [] "much must be left to the trial judge's experience and judgment"'; therefore, the judge's assessment of the credibility of the witnesses and the weight of the evidence is entitled to deference" (citation omitted). Adoption of Elena, 446 Mass. 24, 31 (2006). The father challenges five of the trial judge's findings.[5] We review each in turn.

---

[5] The father also challenges one of the footnotes in the findings: "All findings as to Mother are relevant to Father's appeal, as his plan for cohabitation and co-parenting with Mother being her caretaker when he is at work." We discern no error where the trial evidence established that the father and the mother intended to remain together as a couple and that the father would continue to rely on the mother for caretaking. See Adoption of Larry, 434 Mass. 456, 471 (2001) (evidence supported "judge's finding that the mother did not intend to remain apart from the father, and she would therefore be unable to protect

12

b.  The father's intention to have the mother care for the child.  The judge found, "Father hasn't done anything to get housing, as he works during the week.  I take this testimony to mean he would intend for Mother to caretake [the child] when he is at work."  The judge's conclusion in this regard was a permissible inference from the evidence.  See Adoption of Daniel, 58 Mass. App. Ct. 195, 199-200 (2003) (trial judge may draw reasonable inferences supported by evidence).  See also Care & Protection of Laurent, 87 Mass. App. Ct. at 8 ("Speculation about the mother's future ability to feed her child healthy food, for example, must stem from 'credible evidence'").  The father maintained that he cannot search for housing because of work and has not helped the mother obtain an apartment.  The judge's inference was sound that the father, who (even without the responsibilities of caring for children) is relying on the mother to find an apartment, would depend on the mother to care for the child.  The father now argues that "[t]he Trial Court does not even consider . . . possible alternative childcare plans that Father might implement as any working

_____

[the child] from future abuse. . . .  The evidence indicates a strong level of dependency on the father by the mother, and a continuing intention against severing their relationship").  See also Custody of a Minor, 16 Mass. App. Ct. 998, 1001 (1983) ("[B]esides weighing the capacities of mother and father as individuals, the court is to try to envisage how they interact to constitute a unitary household for the care of the child").

13

parent might choose to do."  The child also contends that "DCF never even questioned Father about a caretaking plan."  To the contrary, the evidence shows that DCF repeatedly attempted to learn the father's parenting plan.  A DCF response worker testified that he had "provided the family with a budget plan and as well as a parenting plan, which were also not completed."  A DCF social worker testified that the family had "stated that they had one [parenting plan] completed through . . . the private social worker that they attained," but "they still haven't . . . brought it into the Department."  The judge was well justified in discerning, from the father's repeated failure to provide a parenting plan to DCF, that he had none.  Cf. Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 134 (1990) ("Being a parent is not a sometimes thing").  We discern no error.

c.  The father's participation in therapy.  The judge found that the "[f]ather tried therapy, but it was not for him.  He stopped after three or four sessions."  The judge also stated, "As of August 2023, Father did three sessions of therapy . . . .  He said he didn't understand why he was in therapy, and it ended.  [The DCF social worker] checked with the therapist.  Father stopped therapy."  Lastly, the judge found that the "[f]ather saw [a therapist] for a few therapy sessions.  Father denies having any mental illness.  He was discharged from therapy."  Contrary to the father's assertion that "there is no

14

evidence anywhere that [he] stopped therapy on his own," the DCF social worker's report stated that she contacted the father's therapist, who reported that the "Father denies having any mental illness. He was discharged from therapy." She further testified that the father "talked to [her]" and did not "understand why he needed to be [in therapy]" and that he never went back to therapy after his first three sessions. The judge reasonably inferred from this evidence that the therapy stopped because the father did not want to continue. The judge, who was best positioned to assess the witnesses' credibility and to evaluate the evidence, did not err. See E.K. v. S.C., 97 Mass. App. Ct. 403, 409 (2020).

d. The father's support of the mother. The judge found that DCF's expert "made some recommendations to help improve parenting time, including trying to set some rules around the use of electronics by the two boys. Social worker . . . noted that after this, Mother did try to set some structure and rules by limiting electronic use. Father did not make an effort to support Mother in these efforts." DCF's expert witness, a psychologist, performed a parental capacity evaluation of the mother and the father. The judge credited the doctor's ultimate opinion and noted that his report, "when considered in conjunction with the trial evidence as a whole," supports a finding of unfitness by clear and convincing evidence. In a

15

relatively minor portion of the report, the doctor concluded that the parents failed to "set limits regarding technology usage" during the visit he attended. At subsequent supervised visits with DCF, however, the mother "utilized some ideas from [the doctor]," and "tried to set ground rules and asked [the older children] to take their headphones off and turn off cell phones during the visit." The DCF social worker noted that the father "did not make any effort to support [the mother] with creating structure and setting the ground rules for [the] visit." The judge's finding was supported by the record.

4. Best interests determination. "Parental fitness and the child's best interests are interrelated inquiries and are considered together." Care & Protection of Laurent, 87 Mass. App. Ct. at 6. "A 'judge who finds parental unfitness to be established has broad discretion to determine what is in a child's best interests with respect to custody and visitation with biological family members thereafter.'" Adoption of Ursa, 103 Mass. App. Ct. 558, 571 (2023), quoting Adoption of Rico, 453 Mass. 749, 756 (2009). An appellate court "defer[s] to the judge's determinations regarding the best interests of the child, and reverse[s] only where there is clear error of law or abuse of discretion." Adoption of Cadence, 81 Mass. App. Ct. 162, 166 (2012). "It is in the best interests of [the child] to have 'parents' who can and who will, on a consistent, longterm

16

basis, assume all parental responsibilities and who can provide [the child] with the stable and continuous care and nurturing she needs and will continue to need as a child." Adoption of Gwendolyn, 29 Mass. App. Ct. at 136. "An abuse of discretion exists where the decision 'amounts to a "clear error of judgment" that falls "outside the range of reasonable alternatives."'" Adoption of Xarissa, 99 Mass. App. Ct. 610, 616 (2021), quoting Adoption of Talik, 92 Mass. App. Ct. at 375.

Without question, this case presented difficulties in determining the best interests of the child. As detailed above, the judge properly found that the father was currently unable to ensure that the child attended school. The father did not prioritize the child's medical appointments. The father did not express any understanding of the mother's substance use and its impacts on the child. The father was still living with a registered sex offender and had no appropriate housing plan.

On the other hand, it was unquestionable that the child had not adapted well to DCF's custody. By October 2023, the child had to be removed from her foster placement because she was causing disruption in the home. After moving into another foster home, the problems continued. She was hurting herself and other children and breaking things. She eventually was placed in a residential program where she could engage in one-on-one therapy and psychiatry services. Moreover, after visits

17

with her parents, the child was sad and expressed that she misses her parents.

As neither option was without flaws, the judge reasonably concluded that DCF custody was a better solution for the child, for now, than placing her in a home with a registered sex offender, in the care of a father who proved incapable of attending to her educational and medical needs and showed no significant improvement over the course of the case. The judge reasonably rejected DCF's assertion that termination of parental rights was in the child's best interests, instead hoping that the father would work to correct his parental deficits and become the responsible caregiver that the child plainly needs. As the judge noted, "[i]t is the fervent hope of this Court that the parents are capable of change." We discern no abuse of discretion in the judge's determination that this, and not return to a situation that already proved inadequate, was the best solution here.

<u>Judgment affirmed</u>.

By the Court (Vuono, Ditkoff & D'Angelo, JJ.[6]),

*Paul Little*

Clerk

Entered: March 13, 2026.

---

[6] The panelists are listed in order of seniority.