CARE AND PROTECTION OF THREE MINORS.

Suffolk. March 7, 1984. — August 13, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Minor,* Care and protection, Custody. *Parent and Child,* Care and protection of minor. *Department of Social Services.*

Although the record in a care and protection proceeding did not support certain findings of fact by the judge as to when the mother attempted to locate her children after their removal from her home by the Department of Social Services, the judge's ultimate conclusion, in light of clear and convincing evidence indicating the mother's unfitness, was not affected by such error. [711]

In a care and protection proceeding under G. L. c. 119, § 24, a judge's findings that the mother of three children was a "disorganized, immature, irresponsible, inconsistent person whose inadequacies as a parent have deprived her children of the basic physical needs of food, clothing, shelter and basic emotional needs" were sufficient, under the standard of "clear and convincing evidence," to support his conclusion that she was currently unfit to care for her children and should not have custody of them. [711-714]

In a care and protection proceeding under G. L. c. 119, § 24, which culminated in an order committing three minor sisters to the permanent custody of the Department of Social Services, the judge's findings in support of his order were deficient in that they failed to show that the judge had considered either the importance of preserving the sibling relationship or the possibility that the children's best interests would be served by placing all three with their paternal grandparents; moreover, the circumstances of the case required that the order provide additional guidance to the department on the issues of the children's eventual placement and their visitation by family members. [714-718]

PETITIONS filed in the Chelsea Division of the District Court Department on April 18, 1978.

On appeal to the Boston Division of the Juvenile Court Department, the cases were heard by *Ireland, J.*

The proceeding was ordered transferred to the Supreme Judicial Court for the county of Suffolk by *Liacos,* J., and was reported by him.

*Jinanne S. J. Elder* for the mother.

*Anthony J. DeMarco* for the minors.

*Joan C. Stoddard,* Assistant Attorney General, for Department of Social Services.

LYNCH, J. On April 18, 1978, a social worker for the Department of Public Welfare[1] (department) filed petitions pursuant to G. L. c. 119, § 24, on behalf of three minor sisters. Anne, Jane, and Mary.[2] On August 9, 1979, and September 13, 1979, a judge of the Chelsea District Court found all three girls in need of care and protection and committed them to the department, pursuant to G. L. c. 119, § 26. After a trial de novo in the Appellate Division of the Juvenile Court Department (Boston Division), G. L. c. 119, § 27, the children were again committed to the custody of the department.[3]

---

[1] Now the Department of Social Services.

[2] At that time, Anne was not quite four, Jane was two, and Mary was one year old. For reasons of anonymity we have given the children fictitious names.

[3] Once again we point out the inordinate length of time required for proceedings of this kind to move through the trial court. At the present time, Anne is ten, Jane eight, and Mary seven. Mary's future has been uncertain for six of her seven years. It seems to have been a combination of factors which caused the long delay in this case. For example, the trial de novo in the Juvenile Court, which began on August 18, 1981, did not conclude until January 28, 1983. The entire proceedings lasted seventeen months. Once a trial begins it should proceed expeditiously to completion. All parties involved then benefit from increased continuity. Efficiency is increased when delays between hearings are kept to a minimum. Another factor contributing to the delay in this case was that the judge in the Juvenile Court did not issue his findings of fact and conclusions of law until six months after the hearings were completed. Not only were the futures of Anne, Jane, and Mary in limbo during this time, but the longer a judge takes to make his findings of fact, the dimmer will be his memory of the testimony. Trial judges have great discretion to assess the credibility of witnesses, based on their opportunity to observe the witnesses' demeanor during trial. In such a case as this, where the character and maturity of one person, the mother, is so much in issue, it is all the more crucial we be assured that the judge actually remembers what the witnesses were like.

Following this decision, the mother, the children, and the maternal grandfather filed notices of appeal.[4] Because the department intended to move the two older girls from the foster home where they had been living since February, 1979, the mother sought a stay of the dispositional order, which was denied by the trial court on July 29, 1983. She subsequently sought from the Appeals Court a stay of the trial judge's order. This request was denied by a single justice on August 23, 1983. On September 1, 1983, the mother and the two older children filed a joint petition for a stay pursuant to G. L. c. 211, § 3, in this court. A single justice denied the application for a stay pending appeal and on September 13, 1983, transferred the cases to the Supreme Judicial Court for Suffolk County. On November 19, 1983, the single justice reserved and reported the cases for decision to the full court of the Supreme Judicial Court.

The mother appeals the judgment of the Juvenile Court judge on two bases. She takes issue with the judge's conclusion that she is unfit to care for her children, arguing that his findings lack the requisite specificity, are not supported by clear and convincing evidence, and are based on inappropriate factors. She also argues that the judge's findings do not adequately consider the individual needs of the children and therefore that his disposition is contrary to their best interests. The children do not dispute the judge's finding of the mother's unfitness, but argue that his findings regarding the children are insufficient to support his order that they be placed permanently in the custody of the department. Specifically, they contend that he failed to consider the sibling relationships and the effect those relationships should have on the ultimate placement of the three girls. The children also argue that the judge should have issued a more detailed dispositional order.

We agree that the facts presented support the judge's finding of the mother's unfitness to care for her children, but we con-

---

[4] The maternal grandmother died in 1983, after the completion of the trial court proceedings. The maternal grandfather joined the children's notice of appeal, but did not file a brief with this court. Both sets of grandparents were represented by counsel throughout these proceedings.

clude that the judge's findings do not adequately address the needs of the children, and we therefore remand the case for further findings and conclusions.

The facts are summarized from the findings of the trial judge.[5] The mother was born in Missouri in 1953. She was removed from the home of her natural parents at the age of two, as a result of physical abuse inflicted by her parents. She was placed in a foster home and at the age of five was adopted by a couple who eventually settled in Maine (the maternal grandparents). She attended high school through the eleventh grade. She took a job as a nurse's aide in a nursing home. During this time she met her future husband who was in the United States military service. The oldest child, Anne, was born on June 19, 1974. In 1975, the couple began to have marital difficulties and the father became physically abusive toward the mother. She moved from the Boston area, where they had been living, to Cape Cod to avoid him. On January 24, 1976, the couple's second child, Jane, was born. The father followed the mother to Cape Cod and lived there with her until May or June of 1977. The third child, Mary, was born on February 4, 1977. During the course of this pregnancy, the mother considered placing Mary for adoption, but decided against it.

The marriage continued to deteriorate and the police were summoned to the house on numerous occasions to prevent the father from beating the mother. After the father left the family,[6] the mother moved to Chelsea with the three children. In April, 1978, the events which led to the involvement of the department occurred. The mother went to Maine to visit a friend, leaving her children in the care of a teenager. She returned to Chelsea after becoming ill, where she was hospitalized for treatment for hepatitis and jaundice. After a few days, she was able to reach her daughter Anne by telephone. The child told her that the babysitter had gone to the store a couple of days earlier and had not returned. She told Anne to bang on the door to at-

---

[5] We discuss, *infra,* the mother's argument that several of the judge's findings are not supported by the evidence.

[6] Since that time, the father's whereabouts have been unknown.

tract a neighbor's attention. She did not call the police or the
department. The department was notified by police that the
children were unattended and on April 14, 1978, they were
taken into the department's care, pursuant to G. L. c. 119,
§ 23E. The children were examined at Massachusetts General
Hospital. The two older girls had no medical problems and
Mary was treated for severe diaper rash. The children were
then placed in temporary foster care. On the same day, the
department filed a care and protection petition pursuant to
G. L. c. 119, § 24, in the Chelsea District Court. Shortly
thereafter, the mother called the department, was told that her
children had been placed in foster care and learned about the
care and protection petition. She did not attend the hearing at
which the District Court judge granted temporary custody of
the children to the department. On June 9, 1978, physical
custody of Anne and Jane was returned to the mother, although
legal custody remained with the department. Once, in July of
1978, and again in October, the department offered to return
Mary to the mother's care. On the first occasion she declined
because she did not feel financially able to care for all three
children. She did take Mary temporarily, from July 5 to July
7, until another foster home could be found. On the second
occasion she declined again. She said she was moving that
weekend. In fact, she did not move until six months later.
Mary was moved to her third foster home, where she has been
ever since. On February 16, 1979, the department was notified
that the mother had left Anne and Jane in the care of a neighbor
on February 14, and had not returned. The children were suf-
fering from severe colds and head lice and were not properly
dressed for the season. At that time, the family was living in
an unheated apartment. The mother was also recovering from
an abortion which had given rise to gynecological complica-
tions. The two oldest children were placed in a foster home
in Lynn where they remained until July, 1983. At that time,
they were moved to the home of their paternal grandparents.[7]

---

[7] It is the intention of the department that Anne and Jane be adopted by
their paternal grandparents. The department also intends that Mary be
adopted by her present foster family.

The record shows that, since 1979, the mother has changed apartments frequently. Some of her apartments would have been suitable for overnight visits with her children, others were too small or crowded. At times she stayed with friends. She has been employed sporadically as a clerk in a variety store or as a nurse's aide. She has been plagued with health problems which have made steady employment difficult. She has worked part of the time in nursing homes, and once as a private nurse for a paraplegic. She moved in with this patient in the summer of 1982. Shortly thereafter, her employer was hospitalized. The employer subsequently filed larceny charges against the mother for cashing two of her disability checks. The mother admits having cashed the checks and having kept some of the money herself, which she says was owed to her as "back" wages. In October, 1982, while her employer was still in the hospital, the mother returned to the apartment to find a former boyfriend there. He had been drinking and refused to leave. The mother called the Chelsea police several times that night for assistance, waiting in a local bar until they arrived. The police did not remove the man at first and at some point the mother and the man became involved in a knife fight in which she received deep lacerations which required treatment at a local hospital. Upon learning of the fight that had taken place in her apartment, the mother's employer fired her.

Since 1978, there have been numerous service plans and visitation schedules worked out between the mother and the department. The record shows that she has resisted the therapy and counselling programs urged by the department, and has been unreliable in keeping appointments with case workers and therapists.[8]

---

[8] In June, 1978, the mother enrolled in a weekly therapy group for mothers with children in protective services. She attended eleven of the thirty-three sessions. She attended a second therapy program during the fall of 1978, but the program was cancelled after a short time. In the summer of 1981, the mother attended six or eight sessions at the Boston Juvenile Court clinic. She stopped participating in the group, claiming it addressed others' problems, not her own. She has steadfastly refused to participate in counselling for alcohol or drug abuse. Her primary reasons for not participating in the

Similarly, she has been somewhat inconsistent in maintaining visits with her children.[9]

The foster mother of the two oldest children maintained an "open visitation" policy, which allowed the mother to adjust her visitation schedule to her work schedule.[10] Visitation with Mary has been irregular. There have been periods of months when the mother has not visited Mary, due in part to personal conflicts with Mary's foster mother and difficulties in scheduling visits that were mutually convenient. When the visits do take place, they are generally successful. The children are always glad to see their mother and they spend valuable time together. When the mother stays overnight at the foster home, she prepares the children's meals and puts them to bed. She picks them up after school and takes them to ballet lessons. She plays with them and helps them with their homework. On one visit to the maternal grandparents in Maine, she taught the children how to swim.

On the other hand, there have been some troublesome incidents. On one occasion in October, 1981, visitation with Mary was changed from unsupervised to supervised status after the mother took Mary to a bar and restaurant. During the 1982 Christmas holidays, the mother was given permission to have an extended visit with Anne and Jane at their foster home. After putting the children to bed on New Year's Eve, she left to attend a party with friends, promising that she would be there in the morning when the children awoke. She returned four days later and did not communicate with the foster mother during her absence.

Both sets of grandparents have also maintained close relationships with the girls, although the department has not always been cooperative in this regard. The three girls often

---

therapy urged by the department are that it is not helpful to her situation and that she cannot afford to pay for it herself and has received little help in locating free services.

[9] The mother usually visits with Anne and Jane at their foster home and with Mary at her foster home. Occasionally Mary comes to Lynn and the mother sees all three children together.

[10] The "open visitation" policy also means that visits need not always be arranged through the department and, therefore, that the department will not necessarily know how frequently visits have occurred.

take vacations with their maternal grandparents, in Maine and in Florida, where the grandparents spend the winters. While they were in the foster home, Anne and Jane saw their paternal grandparents every other weekend and during vacations.

1. *Findings of fact.* The mother argues that several of the judge's findings of fact are not supported by the evidence. We have examined the record with respect to each allegedly erroneous finding and conclude that, for the most part, the judge's findings are warranted. Several of the "errors" pointed out by the mother are really allegations that the judge's descriptions of some events are incomplete in a misleading way. For example, the judge found that the mother had missed an appointment for psychological testing in June, 1981. He did not indicate (as the psychologist had testified) that the appointment was rescheduled, or that the mother attended subsequent meetings. The mother also takes issue with the fact that the judge, while finding that there were periods of time when the mother missed visits with her daughters, did not state the reasons advanced by her for having missed those visits. It is within the judge's discretion to evaluate the credibility of witnesses and to make his findings of fact accordingly. *Kaplan* v. *Bessette,* 357 Mass. 233, 234 (1970). He was not obliged to believe the mother's testimony or that of any other witness.

The judge's findings that the first care and protection petitions were filed by the department on Friday, April 14, 1978, the day the children were first removed from their home, and that the mother did not communicate with the department in an attempt to locate them until April 19, are not supported by the evidence. The petitions are dated April 18, 1978, and the uncontradicted testimony from the social worker involved was that the mother came to his office on Monday, April 17, the first business day after she realized the children had been taken. There is nothing in the record to support the judge's version of events. In light of the other evidence indicating the mother's unfitness, however, this error does not appear to have unfairly influenced the judge's ultimate conclusion.

2. *Fitness.* The removal of a child from the custody of his of her parent may be ordered only if there is clear and convinc-

ing evidence that the parent is *currently* unfit to care for that child. *Custody of a Minor,* 389 Mass. 755, 766 (1983). *Bezio v. Patenaude,* 381 Mass. 563, 576 (1980). Cf. *Santosky v. Kramer,* 455 U.S. 745, 769-770 (1982) (State must prove parental unfitness by "clear and convincing evidence" before parental rights may be irrevocably severed). In addition, the judge's findings of fact must be particularly specific and detailed. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 119-120 (1984). *Custody of a Minor (No. 1),* 377 Mass. 876, 877 (1979). They may not be based on inappropriate factors, such as disapproval of a parent's life-style or a comparison of the material opportunities a foster parent may offer with those offered by a natural parent. *Custody of a Minor,* 389 Mass. 755, 766-767 (1983).

The judge's findings are adequate under this standard to support the removal of the children from the mother's care. He found that she was a "disorganized, immature, irresponsible, inconsistent person whose inadequacies as a parent have deprived her children of the basic physical needs of food, clothing, shelter and basic emotional needs." This conclusion was based on observation of the mother during thirty days of trial in the Juvenile Court. It was based on the testimony of fourteen witnesses, in addition to the mother; it included psychologists, social workers, a relative, and the older girls' foster mother. Although the record indicates that the mother has considerable love for her children and they for her, it also demonstrates a lack of consistency and responsibility on her part. She has been unable to maintain steady employment or a stable home environment and she has been irregular and unreliable regarding visits to her children. We agree with the trial judge that there is clear and convincing evidence that the mother has "grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard" and that she is currently unfit to care for her three children. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 646 (1975).

The mother's argument that the judge relied on inappropriate factors in his determination of her unfitness is not persuasive.

His conclusions of law indicate that he based his determination on the following appropriate factors. The mother on at least two occasions left her children with caretakers who were inappropriate and who, on the first occasion, abandoned them. She has been erratic and unreliable in her visits to the children. She has not provided a clean, healthy home for the children.[11] She has not maintained any sort of financial stability.[12] She lacks insight into the children's emotional needs and is therefore unable to provide them with the psychological nurturing they need. On the other hand, the judge did state that he felt her participation in the knife fight indicated poor judgment, immaturity, and irresponsibility. It was inappropriate for the judge to consider this incident as illustrative of the mother's fitness as a parent. The record does not reveal a history of violence between the mother and her former boyfriend, and she should not be held responsible for an incident caused by another after the police had been unsuccessful in removing him from her apartment. However, it is not likely that the judge's conclusion turned on this incident. As we noted above, a plethora of appropriate evidence existed supporting the conclusion of unfitness. As we are ordering remand of the case (for reasons described below), however, the judge should consider the extent to which he relied upon this incident in reaching his con-

---

[11] On this point, the mother argues that the judge should not have considered her "frequent moves from place to place" and her occasionally unorthodox living arrangements. She cites *Custody of a Minor,* 389 Mass. 755, 767 (1983), for support. That case does not stand for the proposition that the judge may never consider the instability and unsuitability of a parent's living situation as bearing on her fitness to raise her children. A judge's finding of unfitness should not be based on subjective disapproval of the mother's life-style. However, in this case the judge focused on the mother's frequent changes of living arrangements as an illustration of her inability to provide a stable, healthful home environment for her children. A judge is permitted to consider the fact that a mother's home lacks heat during the winter time or, if within her control, it is greatly overcrowded, or is dirty and insect-infested.

[12] A parent may not be found unfit because he or she is poor. *Custody of a Minor,* 389 Mass. 755, 766 (1983). In this case, the judge was concerned not with the mother's poverty, but rather with her inability to hold a steady job and to manage her financial affairs responsibly.

clusion that the mother is unfit and make any changes in his findings and order he deems appropriate.

3. *The dispositional order*. This court has said that the "parental fitness" test and the "best interests of the child" test are not mutually exclusive, but rather "reflect different degrees of emphasis on the same factors." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 641 (1975). In this case, the judge's task was not complete once he had determined that the mother should not have custody of her children. Also, he should have addressed the various placement options which would further the children's best interests and issued more than a broad dispositional order committing them to the permanent custody of the department.

There were two obvious placements for these children. The department's plan was to leave Mary with her foster parents, who planned to adopt her, and to move Anne and Jane from the home of their foster mother to that of their paternal grandparents, who planned to adopt them. This plan was discussed in court and all parties seem to have understood that this is what would happen if the department were awarded permanent custody of the children. Since there is no written proposal, however,[13] it is unclear what, if any, visitation the department would permit the natural mother or the maternal grandfather with the children or, for that matter, the sisters with one another.[14] The obvious alternative is for all three sisters to be adopted by their paternal grandparents. The advantages to this arrangement are that the sisters would all be together and they would remain within their natural family.

We do not decide which of these alternatives is in the best interests of the children. This is the task of the trial judge. The

[13] The last service plan executed by the mother and the department was for June 17 through September 17, 1982. This plan states that the department's "permanent plan is permanent custody of the children and to terminate parental rights." The plan describes a visitation schedule for the mother "pending court decision."

[14] We note that G. L. c. 119, § 39D, does not permit the judge to grant rights for visitation of a minor child who has been adopted by a person who is other than a stepparent.

judge's findings, however, must support his order. *Custody of a Minor*, 389 Mass. 755, 767 (1983).

The judge's findings in this case are deficient in that he failed to address two issues: the importance of the sibling relationship, and whether placement of all three children with the paternal grandparents would be in the best interests of the children. The courts of this Commonwealth have recognized the importance of siblings' being raised together. *Freeman* v. *Chaplic*, 388 Mass. 398, 407-408 (1983). *Duclos* v. *Edwards*, 344 Mass. 544, 546 (1962). *Care & Protection of Two Minors*, 12 Mass. App. Ct. 867, 868 (1981).[15] These sisters have spent time together and have often expressed the desire to live together as a family.

While those two factors would not be dispositive, they highlight the fact that the sibling relationship, particularly, is an issue which the judge should have considered. It has also been our policy to keep children within the natural family whenever possible.[16] "[T]he State is required to make every effort to strengthen and encourage family life before it may proceed with plans to sever family ties permanently."[17] *Petition*

---

[15] See also *Theriot* v. *Huval*, 413 So. 2d 337, 341 (La. App. 1982), quoting *Tiffee* v. *Tiffee*, 254 La. 381, 387 (1969) ("The separation of children of a family, though sometimes necessary, is a custodial disposition that courts seek to avoid. Normally, the welfare of these children is best served by leaving them together, so they can have the full benefit of companionship and affection"); *Mixon* v. *Bullard*, 217 So. 2d 28, 30 (Miss. 1968) ("The court should in all cases attempt, insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister . . . is important in the lives of both of them and to deprive them of the association ordinarily would not be to their best interest"). *Ferencak* v. *Moore*, 300 Pa. Super. 28, 37 (1982) ("The policy that siblings should be raised together is strongly entrenched").

[16] The policy of this Commonwealth, articulated in G. L. c. 119, § 1, appearing in St. 1972, c. 785, § 5, is "the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development."

[17] We note that the case before us is a care and protection proceeding, not a petition to dispense with consent to adoption. Permanent severance of

*of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 376 Mass. 252, 266 (1978).

The judge's finding with respect to Mary was that "removal of Mary from her foster home would be psychologically devastating."[18] We have held previously that it is error to base the allowance of a petition to dispense with consent to adoption only on the fact that the child would be hurt by being returned to the natural parent. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 119 (1984). In addition, the finding here was based upon the assumption that if Mary were removed from her foster home she would be returned to her mother's care. The judge did not discuss the need for Mary to be raised with her sisters or by her grandparents. Findings on this aspect of Mary's case are required to demonstrate that her best interests have been adequately considered. This is particularly true since the department intended to have Mary adopted by her foster parents which, if accomplished, would result in the severance of her relationship with her grandparents. See note 14, *supra.*

the natural parent-child relationship is not a goal in this kind of custody proceeding. The policy that it is generally better to place children within their natural family than without is equally applicable in the care and protection context, however, particularly when the department is awarded permanent, as opposed to temporary, custody of the child.

[18] The judge also concluded that "[t]he lengthy separation between Mary and her mother and the corresponding growth in ties between the child and the prospective adoptive parents indicate that the child would be hurt by being returned to her natural parent." Although we have said that separation from natural parents and bonding with foster parents may result in a finding of parental unfitness, such circumstances are rare. *Custody of a Minor,* 389 Mass. 755, 768 (1983). More to the point is the principle expressed in *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 646 (1975): "Precipitate attempts to force adoption over parental objection simply because foster care has occurred are not consistent with the law and must be avoided." Too often the claim that bonding justifies adoption is the result of a self-fulfilling prophecy. This is especially true here, where the record indicates the girls were separated from the very beginning because the department considered it easier to find parents to adopt one or two children rather than three.

Although a simple commitment order[19] is all that is required
by G. L. c. 119, § 26, and the applicable regulation of the
department, 106 Code Mass. Regs. 234.064 (1978)[20] in this
case, the judge should have given the department some guid-
ance regarding the ultimate placement of the children and vis-
itation by family members.

When the department petitions the court for permission to
dispense with consent to adoption for a particular child, it must
submit to the court a plan detailing where it proposes the child
will be placed if permission is granted. G. L. c. 210, § 3 (c).
Although the department is not required to identify prospective
adoptive parents in this plan, it must provide sufficiently spe-
cific and detailed information with respect to the prospective
adoptive parents and their family environment so that the judge
may properly evaluate the suitability of the department's pro-
posal. *Petition of the Dep't of Pub. Welfare to Dispense with
Consent to Adoption,* 6 Mass. App. Ct. 477, 479 (1978).
Although there is no such requirement in a custody proceeding,
given what the judge knew about the present situation of this
family and the plans of the department to separate the sisters
and to have Mary adopted by her foster family, see note 7,
*supra,* his order should have been more detailed.

In either an adoption or a custody proceeding, the department
enjoys virtually unrestricted discretion in determining matters
of parental fitness and child custody. It "is extraordinarily
influential in its capacity to interfere with family relationships."
*Petition of the Dep't of Social Services to Dispense with Con-*

---

[19] The judge's order simply stated that "Anne, Jane, and Mary be commit-
ted to the Department of Social Services."

[20] General Laws c. 119, § 26, as amended through St. 1983, c. 117,
provides that, if the judge finds that the department's allegations of abuse
or neglect are proved, he "may adjudge that said child is in need of care
and protection and may commit the child to the custody of the department
until he becomes eighteen years of age or until in the opinion of the depart-
ment the object of his commitment has been accomplished, whichever
occurs first; or make any other appropriate order with reference to the care
and custody of the child as may conduce to his best interests." The de-
partmental regulation incorporates this language. 106 Code Mass. Regs.
234.064 (1978).

*sent to Adoption,* 384 Mass. 707, 712 (1981). One commentator has said, "the courts play a minimal role in exercising the state's care and protection policy. The real locus of decision making is within [the department], and the individual who tends to be the ultimate decision maker there, is the case worker." Campbell, The Neglected Child, 4 Suffolk U.L. Rev. 632, 645-646 (1970). As a critic more recently said, "[t]he paternalistic justification for this broad discretion — that the professionals and not the parents always know what is best for children — underlies most of what is wrong with the present system. Thus, reform that fails to end the blind deference to professionals will be inadequate." R.R. McCathren, Accountability in the Child Protection System: A Defense of the Proposed Standards Relating to Abuse and Neglect, 57 B.U.L. Rev. 707, 731 (1977).

When the department is granted *permanent* custody of a child, it has virtually free rein to place that child in a foster home of its choosing, to decree whether, how much, and what sort of family visitation there should be, and to decide whether to have the child adopted. This discretion is subject only to a petition for review which cannot be filed more than once every six months. G. L. c. 119, § 26.

Even if the separation of Mary from her sisters and grandparents is ultimately found to be in her best interests, some direction from the judge regarding continued visitation is required. This is a care and protection proceeding, not an adoption proceeding. See note 14, *supra.* In a case such as this, where the children are aware of their mother, grandparents, and siblings, and where visitation has been significant and valuable in the past, the judge must include in his order some direction to the department that visitation shall continue or make findings that support his conclusion if he believes it should not. Therefore, this case is to be remanded to the Juvenile Court for further proceedings in accordance with this opinion.

*So ordered.*