The father appeals from a decree issued by a judge of the Juvenile Court finding him unfit and terminating his parental rights as to his son, Zalman.[3] He argues that (1) the judge erred in finding him unfit, (2) the judge gave excessive weight to the material advantages offered by the preadoptive mother, (3) no reasonable efforts were made to provide the father with visitation, and (4) the judge abused his discretion in his order for posttermination visitation. We affirm.
Background. Zalman tested positive for opiates at birth in July, 2011, prompting the Department of Children and Families (department) to file the first of three care and protection petitions. Custody of Zalman transferred between the department and one or both of Zalman's parents several times over the next four years. The department initiated the current proceedings in April, 2015. Zalman has been in the department's custody since that time.
The father engaged rarely -- in some cases not at all -- in various programs required by his service plan, including batterer's intervention and anger management programs. He behaved inappropriately at visits with Zalman, and was needlessly confrontational with department staff. The father also missed multiple visits. In September, 2015, the father was found in violation of probation imposed due to an earlier domestic violence incident involving the mother, and he was incarcerated for thirteen months. After his release in October, 2016, and after a trial over the course of five days in early 2017, a judge terminated the father's parental rights in June, 2017.
Discussion. 1. Unfitness. The father asserts that the judge's finding of unfitness was based on clearly erroneous subsidiary findings of failures to cooperate with the department and engage in services. The father points to several instances of his engagement with therapy and other services.[4]
We review "to determine whether the judge's findings were clearly erroneous and whether they proved parental unfitness by clear and convincing evidence." Custody of Eleanor, 414 Mass. 795, 802 (1993). "[S]ubsidiary evidentiary findings need only be proved by a fair preponderance of the evidence." Care & Protection of Laura, 414 Mass. 788, 793 (1993). We do not agree with the father that the judge's subsidiary findings here were clearly erroneous.
The judge expressly acknowledged the father's participation in some services. Three months after his release from prison, the father completed an intake at the Men's Health and Recovery program, and by the end of trial he was engaged in counselling and participated in groups at that program. During this same time period the father also had some (minimal) involvement with the Father Friendly program, started to see a psychiatrist (but did not adequately engage with him and began to see another psychiatrist during trial), and had just begun to participate in Alcoholics Anonymous meetings. The judge was not required to give controlling weight to these efforts, commenced only once termination of the father's rights loomed.
More important, the judge found that the father was not participating in "the services that are most required of [him]," namely batterer's intervention and anger management. The father testified that, while incarcerated, he participated in but did not complete such services because he spent most of his time in disciplinary segregation; he did not supply the requested documentation of his participation. Also, the judge found that the father did not complete a psychological evaluation, and he was in denial about his need for substance abuse counselling. We see no clear error in the judge's findings that the father did not complete critical services "because [he] has simply refused or failed to attend them," and that such refusal and lack of cooperation "had a negative impact on his ability to address the issues in this case."
Relatedly, the judge made extensive findings as to the father's volatile temperament and its negative impact on his fitness as a parent. The father argues that the judge erred in finding that he was "confrontational and difficult without appropriate basis," and that he could not work with professionals to meet Zalman's needs; the father asserts that the most current evidence did not support these findings.
The judge rested his findings not just on one incident, but on many examples of the father's "longstanding pattern of volatile and aggressive behavior," both before and during the pendency of the current petition. These included, among many others, an incident in July, 2015, when Zalman became frightened as a result of witnessing the father's argument with a department social worker, requiring that the visit with Zalman be terminated after only ten minutes. The father engaged in a similar outburst during a visit in January, 2017, just before trial began, and another during a telephone call to the social worker regarding counselling services in April, 2017, just before trial ended. The father cites nothing in the record calling these findings into doubt.[5] We will not disturb the judge's conclusion that the father's established pattern of angry, antagonistic behavior created a risk of harm for Zalman, particularly absent evidence that the father had meaningfully addressed this issue.
2. Material advantages. The father asserts that the judge's termination decision gave excessive weight to the material advantages offered by Zalman's preadoptive mother. We disagree. The judge did not compare the material circumstances of the preadoptive mother to those of the father, but instead considered the father's unfitness independently of the preadoptive mother's suitability as a placement for Zalman.
First, the judge based his decision to terminate the father's parental rights not on one factor alone, but on all evidence before him. In finding the father unfit, the judge relied, among other things, on the father's failure to participate (or consistently participate) in important services such as a batterer's intervention program and individual therapy, the father's angry temperament and the risk it created for Zalman, and his failure to take steps within his control to maintain regular visitation with Zalman.
Next, the judge permissibly considered the father's housing and financial instability in finding him to be an unfit parent. Of course, "[a] parent may not be found unfit because he or she is poor." Care & Protection of Three Minors, 392 Mass. 704, 713 n.12 (1984), citing Custody of a Minor, 389 Mass. 755, 766 (1983). But it is permissible to consider a parent's "inability to hold a steady job and to manage [his] financial affairs responsibly." Id. See Care & Protection of Lillith, 61 Mass. App. Ct. 132, 136 (2004) (parent's frequent moves were factor indicating unfitness); Custody of a Minor, 21 Mass. App. Ct. 1, 8 (1985) (father's inability to offer child "a stable home environment or financial support" was one of several factors indicating unfitness).
Here, much like in Care & Protection of Three Minors, the judge was concerned not simply that the father was poor but that he had "not been consistently employed since his release from incarceration" and had significantly exaggerated his earnings from what sporadic employment he did maintain.[6] The father also asserted that he intended to stay in his former foster father's living room until able to live on his own, but the judge found "no indication" of when the father might be able to do so. The father's living situation had been inconsistent since the outset of the proceeding; even when not incarcerated, he "would bounce [around] for a few months and live in a room or with unknown individuals." The judge properly considered the father's inability to find and remain in housing suitable for Zalman, along with his repeated incarceration (which made him unavailable to parent Zalman) as indicating a "pattern of ongoing instability."[7]
Having found the father unfit, the judge then properly considered the preadoptive mother's circumstances, including her housing situation, her involvement in obtaining an individualized education program (IEP) and speech services for Zalman, and her activities with him. "[T]he judge must consider the adoption plan proposed by [the department] before terminating parental rights." Adoption of Dora, 52 Mass. App. Ct. 472, 474 (2001). Although a judge may not compare the material opportunities offered by the preadoptive and biological parents, Care & Protection of Three Minors, 392 Mass. at 712, that did not occur here.
The judge's references to the preadoptive mother's plan to pay for a private tutor for Zalman, and to her numerous museum memberships from which Zalman benefited, were unfortunate, and risked being misconstrued as such a comparison. But, considering the judge's decision as a whole, we are confident that no such comparison occurred. The judge first made extensive findings about the father's unfitness, as discussed above. The preadoptive mother's suitability as a placement does not negate such findings. Nothing in the judge's decision suggests that he would have come to a different conclusion as to unfitness had Zalman been placed in a different preadoptive home or not yet been placed at all. There was no error.
3. Visitation during incarceration. The father next asserts that the department failed to make reasonable efforts to provide visits with Zalman (and thus to maintain a relationship with him) while the father was incarcerated. The department and Zalman counter that even if the department's efforts fell short, the judge correctly found the father unfit and was required to issue orders in accordance with the child's best interests. See Adoption of Ilona, 459 Mass. 53, 61 (2011). We conclude that the judge did so here.
The father was incarcerated from September, 2015, to October, 2016. It is certainly unfortunate that, due at least in part to a dispute between house of correction administrators and the department over acceptable identification documents for social workers, no visits between the father and Zalman occurred for several months.[8] But the father was also responsible for the lack of visits. As a result of fights, conflicts with other inmates and correction officers, and other rule violations, he incurred twenty-two disciplinary reports and spent 322 days in disciplinary segregation. Under the applicable regulation, he was not entitled to child visitation while in segregation. 103 Code Mass. Regs. § 926.04(3)(b) (2009). Thus, out of three visits scheduled between June and August, 2016, only the August visit occurred, because the father was in segregation on the other two occasions.[9] The judge was entitled to consider this as part of his analysis.
Contrary to the father's assertion, this case is not like Adoption of Rhona, 57 Mass. App. Ct. 479, 490 (2003), where the parents, in violation of department regulations, were deprived of all visitation during the twenty-one month period leading up to the judge's decision terminating their rights. The department's action thus allowed "the parent-child bond ... to continue to deteriorate during a pivotal period in the judicial proceedings," id.; in the meantime, the child formed a bond with her foster parents, which weighed heavily in the judge's decision. Id. at 490-492.
Here, in contrast, the judge did not rely on the lack of visits with the father having led to any bond -- let alone a comparatively stronger bond -- between Zalman and the preadoptive mother.[10] Here, moreover, the infrequent visitation between June, 2016, and the termination in June, 2017, was primarily, if not exclusively, attributable to the father himself. Even after his release from incarceration in October, 2016, the father "cancelled three meetings with the [d]epartment, despite knowing that visitation with [Zalman] would not resume until the meeting had occurred." And at the first postincarceration visit, in January, 2017, the father "refused to sign the rules and regulations form" at a visitation center, "preventing him from being able to schedule any further visits" for the time being. One month later, after a court appearance, the father signed the form and had a visit; but at the next scheduled visit, near the end of trial, the father failed, without explanation, to appear.
The judge properly considered the infrequent visitation between the father and Zalman as a whole, including the periods both during and after the father's incarceration, as one of numerous factors indicating the father's unfitness. Even if the department bore some responsibility for the lack of visits
during part of the father's incarceration, the judge was still required to "rule in the child's best interest." Adoption of Ilona, 459 Mass. at 61. See Care & Protection of Walt, 478 Mass. 212, 228 (2017). There was no error.
4. Posttermination visitation. The judge concluded that Zalman's best interests would be served by two one-hour visits with the father per year posttermination. The judge set scheduling conditions and authorized suspension or termination of visits or visitation under specified circumstances.[11] But his order did not expressly state whether it applied to the postadoption period, or only to the period between termination and adoption. At oral argument before us, the father's view was that it should apply postadoption; the department's and the child's view was that it already does. We express no view on the proper interpretation of the order. Any party that desires clarification may seek it from the judge. See Adoption ofIlona, 459 Mass. at 65 n.16.
Decree affirmed.

The mother stipulated on the first day of trial to her unfitness and to the termination of her parental rights and waived her right to appeal.

We reject the father's reliance on evidence from the two prior care and protection proceedings to attack the judge's findings that the father failed to cooperate with the department during the present proceeding.

The judge was not required to credit what the father characterizes as his testimony recognizing his need for support in order to reunify with Zalman and his openness to any services necessary to meet the child's needs.

Near the end of trial, the father testified that he had contacted the Massachusetts Rehabilitation Commission (MRC) about taking a course to obtain a commercial driver's license. On the final day of trial, counsel for the father introduced in evidence a letter indicating that an appointment for the father with a MRC vocational counsellor had been scheduled for a few days earlier. No evidence was offered regarding whether the father kept that appointment or what its result might have been. The judge was not required to accept this sparse evidence as showing that the father was seriously coming to grips, through seeking government assistance or otherwise, with his financial instability.

Because the father had not had custody of Zalman for several years, it was understandably challenging for the judge to make more particularized findings about the nexus between the father's housing and financial instability and the risk of harm to Zalman. At the same time, greater specificity in this regard would have assisted our review. Cf. Care & Protection of Three Minors, 392 Mass. at 713 n.11. Express findings regarding how Zalman would likely have been harmed by particular aspects of the father's housing arrangements, or by the father's failure to meaningfully address his financial situation, would have been helpful.

Earlier in the proceedings, the judge properly issued two orders, at the father's request, in an effort to remedy this situation. The judge made no findings as to whether, absent the dispute over identification documents, additional visits could actually have occurred, or would have been impossible because the father was in segregation in any event.

The judge made no findings regarding efforts at visitation in September or October of 2016. Evidence in the record indicates that the father was serving thirty days in segregation between late August and late September, and was released in late October.

Nor did the judge rely on the deterioration of any bond between the father and Zalman; he made no express finding that such a bond had ever existed. He did observe that at the time Zalman was placed in the preadoptive home in December, 2016, Zalman had been in the department's care for more than one and one-half years. Moreover, by the time of trial, Zalman was five years old, but, due to the multiple care and protection petitions involving him, he had spent a total of only twenty-two months in the father's care.

The father specifically argues that the judge's scheduling conditions created a risk that few or no visits might occur. Those conditions do not negate the requirement of two visits per year and were not an abuse of discretion. If they are not observed, the father retains the ability to seek relief.