NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-919

CARE AND PROTECTION OF QUIRA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found the mother currently unfit to parent her daughter, Quira, adjudicated Quira in need of care and protection, and committed her to the custody of the Department of Children and Families (department). See G. L. c. 119, § 26. The mother appeals.[2] She contends that (1) the judge found her unfit based on clearly erroneous factual findings and speculation, (2) the judge erred by conflating her "positivity, spirituality, and willingness to follow the [doctors'] recommendations . . . with a lack of insight into [the] [d]aughter's condition and needs," and (3) the mother is currently fit because she plans to keep Quira in a residential

_____

[1] A pseudonym.

[2] The father was also found unfit, but did not file a notice of appeal.

care facility and to follow the recommendations of the medical professionals, which satisfies the "minimally acceptable care" standard. See Care & Protection of Yetta, 84 Mass. App. Ct. 691, 698 (2014). Because the evidence demonstrates the mother's lack of understanding of her daughter's complex medical needs and failure to learn about or plan to care for them, clear and convincing evidence supports the judge's ultimate conclusion of unfitness. We affirm.

Background. We summarize the relevant facts found by the judge, reserving some details for our discussion. The department filed this care and protection petition in September 2022 and assumed temporary custody over the daughter.[3] While in the department's custody and visiting with her parents in June 2023, Quira was struck by a car and sustained life-threatening injuries, including a traumatic brain injury. She was treated for these injuries at Massachusetts General Hospital for three months, until she was discharged to the Disorders of Consciousness program at Spaulding Rehabilitation Hospital (Spaulding).[4]

---

[3] At the same time, the department petitioned for custody of two of the parents' sons (the daughter's brothers). While the sons were also in the department's custody at the time of the accident, custody has since been returned to the parents and was not at issue at the trial.

[4] The judge's finding number 14 states that Quira moved to Spaulding in January 2024, but the record reflects that Quira

At Spaulding, Quira required round-the-clock care to address all functions in life, including "breathing, feeding, communication, self-care, and mobility." The daughter's care team included three attending physicians, physical therapists, occupational therapists, speech and swallow therapists, a nutritional team, and nurses. One of the daughter's attending physicians, Dr. Jennifer Wu, who was qualified as an expert in pediatric rehabilitation medicine, testified that the care team's goal was for Quira to regain as much function as possible through a standardized eight-week program with intensive therapies. While this team successfully stabilized the daughter, her progress was slow, and at the time of discharge she remained fully dependent on a gastrostomy tube ("G-tube") for nutrition and medication, could not communicate in a meaningful way, could only intermittently process information, and lacked control over her limbs.

The parents remained positive about the daughter's treatment at Spaulding and her prognosis, preferring not to discuss the possibility that she may not make a full recovery and viewing that mindset as too negative. At a meeting with her care team shortly after she arrived at Spaulding, the father

moved from Massachusetts General Hospital to Spaulding in September 2023. This discrepancy does not appear to have affected the judge's ultimate conclusions.

3

opted to take Quira for a walk rather than stay for the conversation about her anticipated aftercare. The mother did not attend this meeting as she found it very difficult to participate in discussions about her daughter's condition and care. The parents avoided such discussions throughout the daughter's stay at Spaulding, and their sporadic visits meant they were not present during morning rounds, when care teams typically discussed aftercare options with families.

In January 2024, Quira was discharged from Spaulding and transferred to a long-term residential care facility run by Seven Hills, the only program in Massachusetts that could accommodate the daughter's need for a G-tube. The daughter's attending physician believes, and the judge found, that Seven Hills only treats patients who are in the department's custody. Patients like Quira who are not in the department's custody are typically discharged to a similar residential program in New Hampshire, which does not accept the parents' MassHealth insurance.

At trial -- before Quira's discharge from Spaulding -- the parents testified that she could speak a few words, communicate through blinking, understand everything that was being said, focus and recognize people, respond to instructions, hold a ball, and stand. The judge did not credit the parents' assertions, instead crediting the testimony of the daughter's

4

attending physician, Dr. Wu, and finding the parents' "belief about how much functioning [Quira] has regained differs greatly from what medical professionals at Spaulding have communicated to them."  The judge found both parents unfit, found Quira in need of care and protection, and found it was in her best interests to place her in the department's permanent custody.

Discussion.  "In a proceeding to commit a child to the custody of the department under G. L. c. 119, § 26, the department bears the burden of proving, by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection."  Care & Protection of Erin, 443 Mass. 567, 570 (2005).  See Care & Protection of Ian, 46 Mass. App. Ct. 615, 616 (1999).  Parental unfitness means "grievous shortcomings or handicaps" that put the child's welfare "much at hazard."  Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975).

1.  Subsidiary findings.  The mother's argument that the finding of her parental unfitness was not supported by clear and convincing evidence rests largely on a claim that the judge's subsidiary findings, as they relate to the mother's

5

understanding of her daughter's condition and progress, are clearly erroneous.[5]

In care and protection proceedings, subsidiary findings need only be proved by a fair preponderance of the evidence. See Care & Protection of Laura, 414 Mass. 788, 793 (1993). Taken together, these facts must then prove parental unfitness -- the critical inquiry -- by clear and convincing evidence. Id. While clear and convincing evidence must support a decision of unfitness, a judge's findings will be disturbed only if clearly erroneous. See Adoption of Paula, 420 Mass. 716, 729 (1995). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed'" (citation omitted). Custody of Eleanor, 414 Mass. 795, 799 (1993).

---

[5] The mother also argues that the judge improperly based her decision on speculation because she commented that the trial was "rife with speculation" when sustaining a speculation objection. We take the judge's comment to mean that complex medical cases like Quira's are "rife with speculation" by nature, due to the difficulties of predicting any specific patient's recovery trajectory. As the mother concedes, even Quira's physician "could not predict what [Quira's] long-term outcome would be or exactly what those logistics would entail." Because there was significant nonspeculative evidence about Quira's current situation and the parents' reactions to it presented throughout the trial, we disagree that the judge based her decision on speculation.

Our review of the record reveals that two of the judge's factual findings may be considered clearly erroneous.[6] These are harmless, however, as the findings are not central to the judge's ultimate conclusion of unfitness, which is supported by clear and convincing evidence. See Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003). The mother's remaining challenges amount to dissatisfaction with the judge's weighing of the evidence and decision not to credit her testimony about Quira's progress at Spaulding. We do not reweigh the evidence on appeal, as the judge's "assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference." Custody of Eleanor, 414 Mass. at 799.

First, the mother challenges the judge's finding that "Mother believes [Quira] can grip a ball" as erroneous because the mother testified that Quira "can, kind of, hold the ball."

_____

[6] The first is finding number 38 which states that the medical staff at Spaulding did not let the mother change the daughter's diaper. At best, the record on this issue is unclear: the father testified that staff had not let him change Quira's diaper, but that his "wife can change her diaper." The mother testified that she knows how to change a diaper, but not that she has done so for Quira since the accident. Dr. Wu did not indicate whether either parent can or has changed Quira's diaper. Because no evidence shows that the medical staff at Spaulding did not let the mother change Quira's diaper, this finding is clearly erroneous. See Custody of Eleanor, 414 Mass. at 799.

The second finding concerning the timing of Quira's move to Spaulding, though not challenged by the mother, is addressed in note 5, supra.

7

The mother was asked at trial, "Is [Quira] able to grip a pen or a pencil?" She responded, "Yeah. I know my husband's working on that with her. . . . Right now, she can, kind of, hold the ball." We are not left with the "definite and firm conviction" that the trial judge made a mistake and discern no clear error in this finding (citation omitted). Custody of Eleanor, 414 Mass. at 799.

Next, the mother contests the judge's decision not to credit her testimony that Quira focuses, understands everything that is being said, communicates through blinking or a thumbs up, and speaks a few words, including "hi" and "Mom." The judge did not credit these beliefs because they contradicted observations made by Spaulding's medical professionals, including Dr. Wu, whose testimony she did credit. Dr. Wu testified that Quira was not communicating "in a perceivable way" when she left Spaulding. While the care team could tell when Quira was happy or sad, she did not speak and could not interact with an assistive visual communicator. Moreover, Quira could only understand others and follow simple commands on rare occasions during her stay. The judge's findings that the mother's understanding of Quira's abilities contradicted that of the medical professionals have strong support in the evidentiary record.

8

a.  Seven Hills.  The mother argues that the judge improperly shifted the burden to her to prove current fitness, requiring her to demonstrate that she had crafted "an adequate plan" for Quira's long-term care, as the department had not proven her current unfitness by clear and convincing evidence. See Care & Protection of Erin, 443 Mass. at 570 (burden of proving unfitness rests on department); Care & Protection of Ian, 46 Mass. App. Ct. at 616 (same).

The mother argues that the department did not meet its burden to prove that Seven Hills is the only program in Massachusetts that could accommodate Quira's G-tube, that it only treats patients who are in the department's custody, and that the parents' insurance would not cover her placement there.

At trial, Dr. Wu testified that Spaulding discharged Quira to Seven Hills, which could provide her with the appropriate level of care, in January 2024.  Quira's need for "a residential home type of level of care" drove Spaulding's push for the Seven Hills program.  The department social worker explained that Quira's need for a G-tube seriously limited her ability to access many residential placement options.  Dr. Wu believed this facility only treats patients in the department's custody (though Dr. Wu acknowledged that Spaulding's case manager would know better than her).  And Dr. Wu testified that patients with similar needs to Quira were typically discharged to a

residential program like Seven Hills in New Hampshire.  Because the parents have MassHealth insurance, Dr. Wu testified that the New Hampshire facility likely would not accept their insurance, but that she has seen similar families relocate to New Hampshire to access that care.  She also testified that other Massachusetts programs that could meet Quira's medical and nursing requirements would require some kind of private insurance.

On this basis, the judge found that the facility only treats patients who are in the department's custody, that Seven Hills is the only program in Massachusetts that can accommodate Quira's need for a G-tube, and that there is a similar residential program in New Hampshire, but it does not accept MassHealth insurance.  Contrary to the mother's argument, the judge did not find the mother unfit because of her potential inability to pay for Quira's residential care at Seven Hills.[7]

---

[7] While the judge made factual findings related to the family's income, it does not appear that this affected the judge's ultimate conclusions, and these were proper considerations.  See Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018) ("While homelessness, poverty, and financial instability alone are not sufficient to terminate a person's parental rights, they are proper considerations in an unfitness determination").  We agree with the department's argument that the lower court found the mother unfit where her health insurance limited the options for programs she could access, and, as the judge found, the mother had taken no steps to find alternate programs to meet Quira's needs.  Even if we were to assume error, a plethora of appropriate evidence supports the

The mother contends that Dr. Wu's testimony that other in-State residential programs would require private insurance contradicts the judge's finding that Seven Hills is the only program in Massachusetts that can accommodate the daughter's need for a G-tube; thus, she argues, the judge erred in concluding that Quira could only access Seven Hills by remaining in the department's custody. We disagree. The judge was not required to credit all of Dr. Wu's testimony, see Care & Protection of Three Minors, 392 Mass. 704, 711 (1984), and Dr. Wu also testified that similar patients to Quira who remained in their own parents' custody were discharged to the New Hampshire program. While this could mean those parents also had MassHealth insurance, it may also mean that they found no residential placements that could accommodate their children's needs in Massachusetts. Because the judge's conclusion falls within the range of reasonable alternatives from the evidence, this was not error. See M.G. v. G.A., 94 Mass. App. Ct. 139, 148 (2018) ("[R]esolution of questions of credibility, ambiguity, and contradiction" are for fact finder).

While the testimony about accessing appropriate residential programs was by no means unequivocal, it was uncontroverted, and we are not left with the definite and firm conviction that a

judge's conclusion of unfitness. See Care & Protection of Three Minors, 392 Mass. 704, 713 (1984).

11

mistake has been made.  See Custody of Eleanor, 414 Mass. at 799.  The burden of proof rests with the department -- and the judge's decision makes clear that the judge applied this principle -- but the parents had the opportunity to, and did, cross-examine the department's witnesses on this testimony.[8]  See Adoption of Iris, 43 Mass. App. Ct. 95, 100-101 & n.8 (1997) (reversing unfitness determination where only evidence department offered was testimony by one case social worker and unredacted documents and reports containing multilevel hearsay, where parents were given no opportunity to rebut hearsay or adverse or erroneous information, and where judge declined parents' request to cross-examine documents' and reports' authors).  The contested findings have evidentiary support, and the judge did not shift the burden to the mother to show an "adequate plan" for Quira's long-term care.

2.  Lack of insight into the daughter's condition and needs.  The mother argues that the judge erred by conflating her positivity, spirituality, and willingness to follow the doctors' recommendations with a lack of insight into Quira's condition and needs.

---

[8] The mother argues that Dr. Wu was not qualified to testify that the parents' insurance would not cover Quira's placement at the Seven Hills facility.  The mother did not object on this basis at trial and has waived this argument on appeal.  See Adoption of Kimberly, 414 Mass. 526, 534-535 (1993).

12

"[T]he State interest in protecting neglected children may properly be preventative as well as remedial," and the court need not wait until a child is maltreated before deciding the necessity of "care and protection." Custody of a Minor, 377 Mass. 876, 882-883 (1979). The judge may appropriately assess "prognostic evidence derived from an ongoing pattern of parental neglect" to determine "future fitness and the likelihood of harm to a child." Id. at 883. "Such evidence, particularly where unrebutted by more recent proof of parental capacity, provides a satisfactory basis for a finding of current parental unfitness." Id. (affirming award of custody of newborn child to department where mother had failed to formulate any realistic plan to care for her children already in department's custody, and newborn, although not yet maltreated, was "probable victim of parental neglect"). See Adoption of Jacques, 82 Mass. App. Ct. 601, 608-609 (2012) (finding of unfitness supported where mother had limited understanding of child's diagnoses and was repeatedly unwilling to and procrastinated in seeking services to assist her in understanding his special needs); Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 125 (1984) ("The specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness").

13

The judge did not expressly credit the parents' assertions that they would follow the recommendations of the medical professionals treating Quira, only noting their testimony that they would.  And while the judge credited the parents' desire to maintain a positive outlook about Quira's condition in the face of her traumatic injuries, the judge concluded that their positivity limited their ability to gain insight into their daughter's current condition and to discuss a realistic long-term aftercare plan for her.  In addition to the discrepancies between the mother's and Dr. Wu's understandings of Quira's condition at Spaulding, see section 1, supra, the following evidence supports a finding that the mother was unable to understand her daughter's complex medical needs.

The mother did not want to discuss the possibility that Quira may not make a full recovery, despite Dr. Wu's prediction that she will probably need long-term residential-based care and discussions that her health may be a lifetime concern.[9]  The mother never directly spoke to Dr. Wu, one of Quira's attending physicians, and did not attend the only in-person family meeting held with Quira's Spaulding care team.  While she preferred to get the information from her husband, he was not at the hospital during the care team's working hours or morning rounds.  The

_____

[9] Even on the witness stand, the mother struggled to discuss her daughter's condition.

14

parents were invited to stay overnight to witness a full twenty-four hours of care, including routinely adjusting Quira's position in bed every two hours to avoid pressure sores or injury, but declined.  Because they declined, the parents never received training on how to move their daughter.  Dr. Wu testified that most families are at their child's bedside all day, experiencing the care in real time and gaining a good understanding of how much care is involved to keep the child safe and to meet their needs, and eliminating the need for formal meetings, but this "piecemeal" training did not happen with this family.

At the time of discharge from Spaulding, Quira had very complex outpatient follow-up schedules requiring therapies four or five time weekly.  When Spaulding scheduled time for the parents to participate in these therapies, they attended inconsistently, arriving late or failing to attend at all.  This pattern left Dr. Wu concerned about whether they would get Quira to her outpatient appointments in a timely manner, if custody was returned to them.  The parents had not discussed how they would transport Quira to those appointments.  And while the mother testified that she knew of a transportation service that could help, she had not talked to anybody about setting that up.

When asked what the family would need to do for Quira long-term, the mother consistently answered that they would do

15

whatever needed to be done.  But the mother took no steps towards learning what that might involve:  she did not learn to use or clean the daughter's G-tube, could not name all of her medications, was not trained on moving her, did not know what care went into helping her bathe, did not contact insurance to ask about coverage if the parents regained custody, and did not discuss with medical professionals what would happen when Quira was discharged from Spaulding.  This evidence supported the judge's finding that the mother's stanch desire to stay positive about the future resulted in a lack of insight and inability to understand Quira's condition and needs.

The proper inquiry in determining parental unfitness is whether the parent may "place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child." Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). If a parent does not understand her child's specialized medical condition, that parent's ability to make informed decisions about the child's medical care, advocate for, and care for their child is compromised, putting the child at risk of serious neglect.  See generally Adoption of Breck, 105 Mass. App. Ct. 652, 660-661 (2025); Adoption of Jacques, 82 Mass. App. Ct. at 608-609; Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. at 125.  This risk grows when one care option, albeit a "distant second choice" for

16

Dr. Wu, involves the parents providing "24/7" care for Quira at their own home. It is clear from the judge's specific and detailed findings that she paid close attention to the evidence, see Custody of a Minor, 377 Mass. at 885-886, and weighed heavily the gravity of this risk when finding the mother unfit. This was a proper consideration for the judge in determining fitness. See id. at 883. See also Adoption of Breck, supra at 661; Adoption of Jacques, supra; Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, supra.

3. Unfitness. Finally, the mother contends that because Quira is in a residential care facility, she does not need to provide more than "minimally acceptable" care, which she is currently doing by keeping her in the facility, demonstrating her fitness. See Care & Protection of Yetta, 84 Mass. App. Ct. at 698. We disagree.

As previously discussed, the mother's failure to learn about her daughter's complex medical condition and plan for her future needs creates a serious risk of neglect and harm to Quira. See section 2, supra. The only concrete evidence of the mother's plan for Quira's future care concerned her search for a first-floor apartment or other appropriate housing that could

17

meet her daughter's needs.[10]  This suggests only a plan to care for Quira at home, which was inconsistent with the recommendations of the medical professionals at time of trial. Given this, the judge properly concluded that the parents' lack of understanding or planning for their daughter's specialized needs created a risk that they would push her more than she could tolerate and created unsafe expectations if she returned to their care.

The judge was required to address the various placement options that would further Quira's best interests.  See Care & Protection of Three Minors, 392 Mass. at 714.  It was not error for her to address the mother's failure to plan for any option other than her daughter's return home, which the evidence revealed was not safe, in light of the parents' failure to learn about her daily care.  See section 2 supra.  The social worker testified that the department would keep Quira at Spaulding, with their agreement, until they found an appropriate placement. Her stay at Spaulding, however, had already exceeded the standard amount of time patients remained, especially once progress slowed.  Dr. Wu testified that, when a patient's functional level plateaued, Spaulding typically worked with the

_____

[10] At the time of trial, the family lived on the third floor of an apartment building with no elevator, and Quira would require a specialized wheelchair for the foreseeable future.

18

parents to find an appropriate program that worked for the family. Quira's care team was prepared to plan for her future long-term residential needs; because the parents were still not ready to participate in those decisions, Spaulding planned with the department (the legal decision maker) and discharged Quira to Seven Hills. Spaulding was not required to keep a patient indefinitely just because the parents would not participate in difficult conversations. And the evidence supports the judge's conclusion that the mother would not communicate with the department and the medical providers about Quira's care plan or had not taken steps to propose how she could meet her needs.

Accordingly, given the mother's lack of insight into and failure to plan for her daughter's complex medical condition and specialized needs, and inability to safely care for her daughter, the judge did not err by concluding that the department proved, by clear and convincing evidence, that the

19

mother was unfit to further the welfare and best interests of Quira.

                              Judgment affirmed.

                              By the Court (Blake, C.J.,
                                Desmond & Singh, JJ.[11]),

                              Clerk


Entered:  October 9, 2025.

---

[11] The panelists are listed in order of seniority.

20