NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-487

CARE AND PROTECTION OF UMEKO.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A judge of the Juvenile Court adjudicated the father currently unfit to parent the child, and the child in need of care and protection, and granted custody of the child to the Department of Children and Families (department). See G. L. c. 119, § 26. The father appeals, arguing that the finding of unfitness was not supported by clear and convincing evidence. The father also argues that the finding that the child requires placement in a residential program cannot stand, because the finding conflicts with the child's individualized education plan (IEP) and did not comply with the special education system for disabled children, and because the finding was based on the

_____

[1] A pseudonym.

opinion of a clinician who was not qualified as an expert witness.[2]  We affirm.

Background.  We summarize the judge's findings of fact, supplemented by undisputed evidence from the record.  The child was born in July 2012.  When the child was four years old, she was diagnosed with level 3 autism spectrum disorder.  At the time the department obtained emergency custody of the child in June 2017, the child was living with the mother and maternal grandmother, who had guardianship of the child.[3]  The father and mother had ended their relationship in 2013, and the father had moved to Florida in 2016 to care for his grandfather.  When the father learned that the child was in the department's custody, he returned to Massachusetts and expressed an interest in taking custody of the child.

The child is nonverbal and cognitively delayed.  After she entered the department's care in June 2017, she had several

---

[2] The mother did not appeal from the adjudication that she was currently unfit to parent the child.

[3] The department's June 2017 emergency removal of the child was the culmination of multiple reports of neglect of the child beginning in 2014 and the department's investigation of those reports.  The child's school reported that she had a poor attendance record and chronic head lice and that when she did attend school, her diaper was soiled and her hygiene was generally poor.  During visits to the child's home, the department workers saw holes in the wall caused by the child's head butting, and dirty and unsanitary conditions.  The maternal grandmother announced that she no longer wanted to be the child's guardian.

placements before being placed in the Evergreen Center (Evergreen) in July 2018, where she remained at the time of trial. Evergreen is a residential treatment program, where the child attends school and lives in a home with the same peer group; the educational objectives and residential objectives are very similar, and designed to build up her skills "across settings and across people." It is undisputed that the child "has made great progress" while at Evergreen.[4] The judge found that despite the child's progress, however, she required twenty-four hour "attentive supervision," as well as specialized instruction and intensive treatment, as provided by Evergreen.[5]

---

[4] When the child started at Evergreen, she was unable to communicate, either verbally, by sign language, or by gestures. She had tantrums, banged her head on the wall, and "headbutted" staff members. She was not toilet trained and had issues with food and eating.

By the time of trial in June and July 2021, the child was able to communicate on a limited basis by modified sign language and she was learning to use a device to communicate some of her needs. She used the bathroom independently, was banging her head less frequently and against softer surfaces when she did so, and had fewer issues with food and eating.

[5] Because the child wakes up in the middle of the night several times per week and sometimes does not go back to sleep, she is monitored by Evergreen staff all night. There was also evidence that the child "requires a lot of really specialized instruction [such as] careful arrangements of stimuli and reinforcement contingencies in order to learn effectively," and that even with such special instruction, "it has still taken her a very long time to learn new skills."

The judge further found that the child would regress if she were to live with the father.

The father is able to visit the child anytime at Evergreen as long as he gives notice. He has also had four overnight visits with the child in his home since December 2020, and neither Evergreen nor the department had any concerns after these visits. However, the father has not been consistent about attending training sessions offered by Evergreen, IEP meetings, and treatment meetings.

It is undisputed that the father has "really positive" interactions with the child.[6] He has "maintained communication with the Department and been generally compliant with his action plans." The child is described as happy, "always laughing and gigg[l]ing."

Discussion. In a care and protection case, the department must prove, "by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection" (citation omitted). Care & Protection of Rashida, 489 Mass. 128, 131 (2022). We do not disturb a judge's findings unless

_____

[6] The clinician testified "that [the father] really cares about her and he loves her . . . . [T]hey definitely have a way to communicate with each other a little bit." The department social worker testified that the child responds positively to the father during their visits and engages with him.

4

they are clearly erroneous. See Care & Protection of Vieri, 92 Mass. App. Ct. 402, 405 (2017). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). "[T]he assessment of parental fitness must focus on the [child] actually involved in the proceedings, with [her] specific needs, interests and requirements, and not on some hypothetical child . . . . Fitness to act as a parent, in statutory and decisional context, involves inquiry not only into the capacity of the biological parent but into the best interests of the child. Parental fitness and the child's best interests are interrelated inquiries and are considered together" (quotations and citations omitted). Care & Protection of Laurent, 87 Mass. App. Ct. 1, 6 (2015).

We reiterate that "[t]he burden of proof on the department" to prove current unfitness is "heavy." Care & Protection of Elaine, 54 Mass. App. Ct. 266, 271 (2002). "The requisite proof must be strong and positive; it must be full, clear and decisive" (quotation and citation omitted). Id. The evidence here is sufficient to meet that high standard.

1. Father's unfitness. The father argues that it was not shown by clear and convincing evidence that he was unfit -- that

5

is, that he had "grievous shortcomings or handicaps that put the child's welfare much at hazard" (quotations and citation omitted).  Adoption of Greta, 431 Mass. 577, 587 (2000).  He notes that there have been no allegations that he abused or neglected the child, and that he completed all the action plan tasks.  He emphasizes that it is undisputed that he "has a special bond with" the child and that he loves and cares for the child.  He also contends that he has shown that he can provide the care the child needs, inasmuch as he has administered to all of her needs during his visits with the child, including the four overnight visits, without generating any concern from Evergreen or the department.

In his thoughtful decision, the judge recognized that the father clearly cares for the child, but based the finding of current unfitness on the father's inability "to further the welfare and best interests of" the child.  The critical facts are that the child has "extensive needs," and that the father has not demonstrated that he can care for those needs at this time.  Rather, the judge found that the father did not have "full understanding of [the child's] needs, and he has not consistently demonstrated a willingness to meet them."  The judge also expressed concern that due to the father's minimization of the child's needs, and his inconsistent attendance at treatment sessions and meetings offered by

6

Evergreen, "[the child] will not receive appropriate and necessary services and structure if she were transitioned home at this time."  The judge also concluded that the father's "handful of incident-free overnight visits does not support the conclusion that Father is fit to parent his daughter on a full-time basis."  There was clear and convincing evidence to support these findings,[7] see Care & Protection of Laura, 414 Mass. 788, 790 (1993), and "the judge did not abuse his discretion or commit a clear error of law in determining that the [father] was unfit," Adoption of Luc, 484 Mass. 139, 147 (2020).

2.  Subsidiary findings of fact.  In challenging the unfitness finding, the father also challenges certain subsidiary findings as not supported by clear and convincing evidence.  Many of his challenges are "no more than a disagreement with the judge's weighing of the evidence and credibility determinations regarding witnesses."  Adoption of Don, 435 Mass. 158, 166 (2001).  For example, the father takes issue with the judge's statement, in finding no. 57, that the father left a treatment

_____

[7] The judge could have relied on the following testimony by the father to conclude that the father was currently unfit.  The father had not read the child's IEP in its entirety but what he took away from it was that "she doesn't have good speech"; the father did not know the methods by which Evergreen taught the child to decrease head-banging behavior; further, he did not understand why the child was prescribed her medications, did not fully understand the programs developed by Evergreen to increase the child's communication skills, and was not aware that she was under the care of a psychiatrist.

meeting at Evergreen when told that there is no cure for autism, and that the father "testified that he was in denial and did not want to hear that his daughter would always be this way." The father argues that "[t]his finding is factually inaccurate and misrepresents" his actual testimony. The father does not contest that he left the treatment meeting, however, nor does he contest that he used the word "denial" to describe his reaction to what he was being told about his daughter. We see no material error in the judge's characterization of the father's testimony.

Similarly, finding no. 58, in which the judge found that the father "lacks a complete understanding of the medication he administers to [the child] when she is in his care," is supported by the father's testimony that he does not know "what [the medications] are meant to treat." In finding no. 71, the judge stated that the child still "requires attentive supervision, [twenty-four] hours per day"; the father objects to this statement as it "suggests that such supervision cannot be accomplished in Father's custody." We do not agree with the father's description of the finding. Rather, we view this statement, in the context of the entire finding, as a recounting by the judge of the child's nighttime routine at Evergreen, and as supported by the evidence.

8

The father contests finding no. 73 insofar as it states that the clinician from Evergreen "testified, and the Court so credits, that [the child] would regress if she were returned home right now."  The remainder of the finding states, "The Court is concerned with Father's understanding of [the child's] needs at this time.  Evergreen provides services and trained-staff supervision around the clock. . . .  She requires specialized instruction and intensive treatment.  It has taken her a few years to develop new skills even with this type of instruction."  The judge accurately reprised the clinician's testimony, and we are not persuaded by the father's claim that this finding impermissibly shifted the burden of proof to him to prove that he was unable to meet the child's needs.  We discuss the father's argument regarding the clinician's qualifications infra.

The father also challenges findings no. 78 and 79 -- which discuss the father's failure to fully understand the child's needs and his minimization of her diagnosis and prognosis -- but those challenges are unavailing as they are supported by the father's own testimony.  For example, the father testified that the child does not "deserve[] to live" at Evergreen, that "[s]he needs to be around more kids that are more awake so she can awake that motor skill in her head," and that she has never been aggressive and that her main problem is her lack of speech.  The

9

judge was not required to accept the father's views of the child's needs and situation in light of other evidence in the record that contradicted the father's views -- to the effect that the child needed intensive support and constant supervision.  See Care & Protection of Olga, 57 Mass. App. Ct. 821, 824 n.3 (2003) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" [citation omitted]).

3.  Child's need for residential placement.  The father argues that the judge's conclusion that the child requires a residential school placement cannot stand because such a placement was not included as a component of the child's IEPs.  According to the father, the judge transgressed State and Federal laws by in essence amending the child's IEPs, or making a finding that contradicts them.  See Kelly K. v. Framingham, 36 Mass. App. Ct. 483, 484 (1994) ("The rights of all children with disabilities are provided for in an extensive and detailed legislative and regulatory scheme, both Federal and State").  We disagree, however, because the premise of the argument -- that the child's IEPs did not contemplate a residential placement -- is incorrect.  Indeed, the IEPs contain an acknowledgement that the child was placed at Evergreen and that the cost of the placement was shared by the local school system and the department.

The father also argues that the judge's conclusion that the child required a residential placement violated 603 Code Mass. Regs. § 28.01 (2014), which requires that a child with special needs be educated "in the least restrictive environment." However, the judge was entitled to conclude, based on all the evidence, that placement in a residential program was the least restrictive environment for this child. There was testimony, and the judge found, that the child required twenty-four hour supervision. The judge was not required to accept the father's belief that the child could and should live at home with her family. See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984) (judge "not obliged to believe the [parent's] testimony or that of any other witness").

4. Testimony of Evergreen's clinician. At trial, the clinician was asked her opinion about whether it was better for the child to be in a residential program, as opposed to living with the father and attending a day program. An objection to that question was sustained. The clinician was then asked if she had any concerns if the child were returned to the father's custody. There was no objection to this question, and the clinician answered that she "would be concerned that [the child's] progress would regress" because "she would not be receiving the intensive treatment that she would require in order to maintain [the skills she had achieved] or to learn

11

effectively new skills that she could carry from one setting to the next." The clinician also testified without objection that she had concerns that if the child were moved to a day program, her regressions could be safety issues because she lacked "self-preservation skills."

The judge credited the clinician's testimony. The father argues that the clinician should not have been allowed to testify about what would happen if the child were returned to the father's custody because she was not qualified as an expert. Although the father objected to the first question, whether it was better for the child to live with the father or in a residential program, no objections were raised as to the subsequent questions and answers about the clinician's concerns. The argument was accordingly waived. See Adoption of Carla, 416 Mass. 510, 515 (1993). In any event, the clinician testified to her "concerns" based upon her personal observations and knowledge of the child; such testimony was within the purview of a lay witness. And lastly, even without consideration of the clinician's testimony complained of by the father, the judge could fairly infer from all the evidence that the child would not continue to make progress if she instead lived with the father.

5. Father's financial status. The father argues that the judge "predicated" his finding of unfitness "on Father's

12

inability to pay for private residential care."[8]  Father's br. 47.  This is based on the judge's finding that "[i]f custody were returned to Father, the Department would no longer fund the residential services at Evergreen. . . .  [The child's] IEP does not include residential services."  The father reasons that "[e]ven if there was enough evidence to show that the child needed residential level of care, that finding alone would not be sufficient to find a parent unfit, unless one also finds that Father's inability to pay the steep program fee is the reason for his unfitness -- a conclusion not only precluded by current caselaw but also patently absurd."

We are not persuaded by the father's reasoning.  A review of the judge's findings and conclusions indicates many reasons for the judge's finding of unfitness that are unrelated to the costs of residential services.  Moreover, in the passage the father highlights, the judge was not making a finding about the father's financial status, but instead, was explaining that the child could not attend Evergreen if she lived with the father because (1) Evergreen was a residential program and did not permit students to only attend the day program, (2) Evergreen was not approved as a day school, and (3) the child's local school system had not agreed to pay for her to attend a

_____

[8] The clinician testified that Evergreen's annual tuition was "around $200,000."

residential program like Evergreen.  We see no basis for the father's claim that the finding of unfitness was "premised" on the father's inability to pay Evergreen's tuition.

Conclusion.  The judge recognized, as do we, the father's "commitment and love for his daughter."[9]  However, the judge was also constrained to consider the child's very special needs and specific disabilities in determining whether the father was fit to parent this child.  See Adoption of Abigail, 23 Mass. App. Ct. 191, 193 (1986) (child's "special needs are relevant because they bear on whether this particular [parent] can be a fit parent to this particular child").  See also Guardianship of Estelle, 70 Mass. App. Ct. 575, 581 (2007) ("A parent may be fit to raise one child but not another").  We note that the department did not seek a termination of the father's parental rights and that the permanency plan remains reunification of the child with the father.  To that end, the judge encouraged the father "to continue working with [the child] and [Evergreen] toward an eventual reunification and the filing of a review and redetermination petition, when appropriate, in the future."  See G. L. c. 119, § 26 (c) (parent "may petition the court not more than once every [six] months for a review and redetermination");

---

[9] A finding of parental unfitness is "not a moral judgment or a determination that the [parent] . . . does not love the child." Adoption of Knox, 102 Mass. App. Ct. 84, 95 n.16 (2023), quoting Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017).

14

<u>Care & Protection of Erin</u>, 443 Mass. 567, 572 (2005) (parent may seek review and redetermination of custody order if he can "present some credible evidence that circumstances have changed"). In the particular circumstances present here, there was no error in the judge's finding that the father is currently unfit.

<u>Judgment affirmed</u>.

By the Court (Englander, Grant & Brennan, JJ.[10]),

*Joseph F. Stanton*

Clerk

Entered:  April 20, 2023.

---

[10] The panelists are listed in order of seniority.

15